48 So.3d 234 (2010)
Donald MARIN, Sr., Engsfeld F. Marin, III, Clyde J. Breaux and Veronica Marin Breaux
v.
EXXON MOBIL CORPORATION, formerly known as and Successor in Interest to Exxon Corporation ND Humble Oil & Refining Company, Atlantic Richfield Company, Legacy Resources Co., L.P., MJF Property Management, L.L.C. and Mike Bourgeois.
Nos. 2009-C-2368, 2009-C-2371.
Supreme Court of Louisiana.
October 19, 2010.
*238 Liskow & Lewis, PLC, Donald R. Abaunza, Jamie D. Rhymes, Robert Beattie McNeal, Joe Barrelle Norman, New Orleans, for Applicant in No. 2009-C-2368 and Respondent in No. 2009-C-2371.
Martin Bofill Duhe; Talbot, Carmouche & Marcello, Victor L. Marcello, John Hogarth Carmouche, Donald T. Carmouche, Gonzales; Weeks & Gonzalez, APLC, Patricia Elise Weeks, John Paul Gonzalez, New Orleans, for Respondent in No. 2009-C-2368.
Talbot, Carmouche & Marcello, Donald T. Carmouche, Victor L. Marcello, John Hogarth Carmouche, Gonzales; Weeks & Gonzalez, APLC, Patricia Elise Weeks, John Paul Gonzalez, New Orleans, for Applicant in No. 2009-C-2371.
Marshall Taylor Darden, New Orleans, for amicus curiae Louisiana Landowners Association.
VICTORY, J.[*]
We granted writ applications in this oilfield contamination "legacy litigation"[1] primarily to consider complicated issues of prescription, subsequent purchaser rights, restoration obligations, punitive damages, and ground water remediation obligations. After considering the record and the applicable law, we find the lower courts erred in applying the doctrine of *239 contra non valentem to suspend prescription on plaintiffs' tort claims. Further, the oilfield contamination at issue does not constitute a continuing tort. Accordingly, plaintiffs' tort claims have prescribed. However, as mineral and surface leases are still in effect as to the "Marin plaintiffs,"[2] Exxon Mobil Corporation ("Exxon") owes a duty to remediate the contaminated property which they have failed to do; therefore, the Marin plaintiffs have a valid contract claim against Exxon. However, because there is no lease in effect on the land now owned by the "Breaux plaintiffs" and any tort claims they may have had have prescribed, we need not analyze their rights as subsequent purchasers. Further, as the Marin plaintiffs' tort claims have prescribed, they are not entitled to punitive damages. The Marin plaintiffs are entitled to compensatory damages as awarded by the trial court. Finally, as found by the trial court, the Groundwater Act does not apply to plaintiffs' claims because the groundwater involved is a Classification III aquifer, and plaintiffs are not entitled to damages for cleanup of this Class III aquifer.

FACTS AND PROCEDURAL HISTORY
This suit involves two pieces of property in St. Mary Parish upon which Exxon, or its predecessors,[3] conducted oil and gas exploration, production and transportation activities. The first piece of property, hereinafter referred to as the "Marin Property," consists of 204 acres of marsh and fields owned by siblings E.F. ("Engsfeld") Marin, III, Veronica Marin Breaux, and Donald Marin. They inherited this land from their father, E.F. Marin, Sr., in 1978. In 1936, E.F. Marin, Sr., granted a mineral lease to W.S. Mackey in exchange for payment of 1/8 of all oil and gas production (the "Marin Lease"). The Marin Lease was later acquired by Humble. In 1941, E.F. Marin, Sr. granted a surface lease to Humble on approximately twenty acres of the Marin Property, where it built a canal and a landing/terminal for coastal operations. This lease, as amended and novated in 1994, 1997 and 2001, is referred to as the "Surface Lease."[4] Subsequently, in 1977 and 1978, Clyde Breaux and Veronica Marin Breaux purchased approximately 70 acres very near the Marin Property (the "Breaux Property"). This property was subject to a mineral lease granted by Canal Bank and Trust Company ("CBT") to Humble (the "CBT Lease") in 1937. E.F. Marin, Sr., lived on the Marin Property until his death in 1987, while Engsfield Marin III has lived there all his life. The Breauxs have lived on their property ever since they built their home there in 1986. In addition to the oil and gas activity conducted by Exxon, these properties have been used for sugarcane cultivation.
Pursuant to the Marin, CBT, and Surface Leases, Exxon installed and operated oil and gas facilities and a landing/dock *240 terminal on plaintiffs' properties. In conjunction with the various production facilities, Exxon built separators, oil gathering systems, and pits used for skimming oil from saltwater and other fluids routinely produced with oil and gas. As oil was skimmed from saltwater in the pits, byproducts of oil and gas operations, including oil, sludge, barium, chlorides, and other contaminants, were accumulated inside the pits in varying amounts. These pits were open and unlined, as was the industry practice and custom at that time. The produced water[5] in these pits was discharged into a nearby waterway.
By 1958, sugarcane farmers on the Marin Property were aware that sugarcane growth was affected on and near former unused pit sites. In the 1980s, plaintiffs were concerned that sugarcane would not grow properly in the pit areas. E.F. Marin, Sr.'s son-in-law, Clyde Breaux, acted as the "family representative" on matters involving Exxon and demanded that Exxon clean the fields and make them usable for cane farming. Breaux characterized the problems they saw as follows:
We had pipe in the field. We had cement in the field. We had something in the field that wouldn't allow us to grow cane in spots. We didn't know what it was, though. We just knew we had bare spots in the field.
Between 1988-1990, Breaux made numerous demands upon Exxon to clean up the property so that they could continue to grow sugarcane, including that "every bit of contamination [be] removed from the site and new dirt hauled in."
At about the same time, in 1986, the Louisiana Department of Natural Resources ("DNR") amended Statewide Order 29-B to require the registration and closure of existing unlined oilfield pits. The amended regulations also required that various enumerated contaminants in the soil be remediated to certain standards. Between 1987 and 1991, Exxon closed all of the remaining pits on the Breaux and Marin properties and represented that it was remediating the pit areas to Statewide Order 29-B standards. During the pit closure process, Breaux routinely communicated with Exxon employees regarding the remediation work. The last efforts to remediate the pits occurred in 1991. On September 4, 1991, Exxon instructed Breaux that in order to have his land returned to him for farming, he would have to sign a release, which he did.[6] Thereafter, on May 18, 1994, the Marin plaintiffs and Exxon entered into a Lease and Novation Agreement that superseded the 1941 Surface Lease. This agreement was amended in December, 1997 and April, 2001. In conjunction with these amendments and leases, Exxon compensated the plaintiffs for sugarcane loss. Although production on the properties began to dwindle in the 1980s, the Marin Lease and the Surface Lease as amended and novated remained in effect at the time suit was filed.
On February 23, 2003, this Court issued its decision in Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686.[7] Evidently prompted by that decision, *241 plaintiffs hired an environmental expert, Gregory Miller, who began an assessment of the property in July of 2003. Miller reported that there was significant contamination at both the Breaux and Marin properties.
On November 26, 2003, the plaintiffs filed suit against Exxon asserting claims for remediation of the soil and groundwater and other damages arising out of Exxon's oil and gas activities. Plaintiffs alleged that Exxon knowingly disposed of oilfield wastes in unlined earthen pits and/or released the waste directly into waterways, resulting in contamination to their property. Plaintiffs alleged that the oilfield wastes deposited into these pits and water bodies contained naturally occurring radioactive material ("NORM"), produced water, drilling fluids, chlorides, hydrocarbons, heavy metals and other toxic substances. Plaintiffs claims were in tort and breach of contract including: negligence under La. C.C. art. 2315; strict liability under La. C.C. arts. 667, 2317 and 2322; continuing nuisance and trespass; breach of oil, gas and mineral leases, breach of the Mineral Code; breach of the obligation to restore the property to its original condition under La. C.C. arts. 2719 and 2720; punitive damages under La. C.C. art. 2315.3; injunctive relief; and liability under La. C.C. art. 486 for fruits of continuing trespass and unjust enrichment.
At trial, plaintiffs produced evidence of extensive contamination of soil and groundwater arising out of Exxon's operations on the plaintiffs' property, primarily caused by Exxon's use of unlined earthen pits to store and dispose of produced water and other oilfield wastes. The evidence showed that although it was the common industry practice, Exxon knew as early as the 1930s that environmental damage, particularly saltwater seepage, resulted from the use of unlined earthen pits. By 1970, Exxon knew of "chronic pit pollution problems" on plaintiffs' property but continued to use the unlined pits to handle produced water and drilling water for decades and ignored best industry practices for handling this waste. Exxon's test results from 1987 showed salt contamination from a depth of 4-20 feet. Further, the evidence showed that Exxon was discharging vast amounts of saltwater into a freshwater canal, Leopard Bayou, pursuant to a permit that was issued based on misrepresentations made by Humble to obtain the permit. This permit was granted in 1942 based on Humble's representations that Leopard Bayou was a saltwater environment and that they were producing 31 barrels per day. In 1966, an internal memo revealed that they were actually producing 70,953 barrels per day, but would not report this to the state "as an adverse ruling could prove costly to Humble." In that same memo, Humble rejected the idea of installing a saltwater injection *242 well to deal with the produced water rather than discharging it into the bayou. In 1988, the DEQ discovered that the area of discharge was actually a freshwater environment and ordered Exxon to cease all produced water discharges, which it evidently did.
In addition, by 1986, Exxon knew that produced water contained NORM radiation and by at least 1993, learned that NORM radiation existed in the area of its pipe cleaning facility on the Marin property. Plaintiffs' expert testified that NORM "comes up with the produced water in small quantities, but it concentrates in the scale in the pipes." Exxon never notified the state of this NORM contamination, as required by the self-reporting provisions. When the DEQ learned of the NORM radiation in pipes, it ordered the oil industry not to remove the pipes before cleaning the contamination and testing the pipes. This occurred prior to 1993 but Exxon did not comply with this order.
Further, after the government ordered the pits closed by 29B, Exxon's remediation and closure did not meet 29B requirements and the property remains contaminated today. In addition, Exxon did environmental assessments of the properties in 1993 and 2001 for internal purposes which showed the properties were contaminated with salts, heavy metals, and radiation, all in excess of regulatory limits, yet did not tell plaintiffs of these findings. Plaintiffs presented expert testimony regarding the costs to remediate the property to 29B standards and the costs to remediate the property to its original pre-lease condition. Finally, plaintiffs presented evidence that the contamination had reached the groundwater underneath plaintiffs' property, and argued that this property was a Class II aquifer which was required to be cleaned pursuant to the Groundwater Act, La. R.S. 30:2015.
After a five-day bench trial, the trial court found that continuous contamination of various chemicals deposited by Exxon on the Breaux and Marin Properties was unreasonable and constituted negligent operations by Exxon, resulting in breach of contract and negligence. The trial court found that Exxon had knowledge since the 1930s and 1940s that unlined pits could leak and were the potential for significant damage to soil conditions, that Exxon's pits leaked into the soil resulting in "outrageous levels" of chemicals in the soil, and that Exxon was given ample opportunity to remediate this site but failed to do so. In addition, the trial court found this conduct was "unreasonable and constitutes negligent operations by the lessee," resulting in breach of contract and negligence. The trial court rejected Exxon's claims that the plaintiffs' action had prescribed, finding that the doctrine of contra non valentem applied such that prescription did not begin to run until 2003, when plaintiffs received an expert report delineating the scope and magnitude of the damage. The trial court reasoned that even though plaintiffs knew there were some problems associated with the pits and that cane would not grow in pit areas, the average person would have no knowledge of whether a pit was properly cleaned or the extent of any damage, and further, that plaintiffs relied on Exxon's assertions in 1991 that it had remediated the pits in compliance with state regulations. The court found the release signed by the Breauxs in 1991 was obtained by Exxon by fraud and misrepresentation, because Exxon deceived Breaux with misleading lab results. The trial court terminated the Surface Lease, finding that the Surface Lease provided the lessors had the right to immediately terminate the lease upon any violation of any *243 applicable environmental standards.[8] The Marins were awarded compensatory damages in the amount the court found it would take to remediate the soil to state regulatory standards, $15,115,390.65. In addition, the Marins were awarded $3,481,317.62 to remediate groundwater that would accumulate in the excavated soil during soil removal and $2,408,868 for canal contamination. The court awarded the Marins punitive damages under La. C.C. art. 2315.3 for activities occurring during the time period that statute was in effect, 1984-1991, in an amount equal to the amount of compensatory damages, $21,005.576.27. Punitive damages were awarded because the trial court found the chemicals left on the property were hazardous and toxic and that Exxon's conduct constituted a wanton and reckless disregard for the environment. The Breauxs were awarded $340,18.73, in compensatory damages, which included $276,498.35 for remediation of contaminated soil and $63,682.38 for handling groundwater intrusion during soil remediation operations, and were awarded $340,180.73 in punitive damages. The trial court rejected plaintiffs' claims for remediation of the groundwater.
The judgment was affirmed on appeal. Marin v. Exxon Mobil Corporation, 08-1724 (La.App. 1 Cir. 9/30/09), 2009 WL 7004332 (unpublished). The appellate court found that that the doctrine of contra non valentem applied to suspend the running of prescription because plaintiffs lacked sufficient knowledge of the nature or extent of the damages or contamination to commence the running of prescription until they received an expert report in 2003. The court further found that Exxon lulled plaintiffs into inaction by misrepresentation.[9] Regarding the Breaux Property, *244 the court found that as a subsequent purchaser of property containing open pits and ongoing oil and gas operations, the Breauxs had a right to recover damages from Exxon arising in breach of contract and tort because the right to recover damages was a "property right," and not a personal right. The appellate court found no manifest error in the trial court's awards of punitive damages, finding "ample evidence to support the trial court's finding that Exxon engaged in wanton and reckless conduct." However, the court of appeal rejected plaintiffs claims for additional compensatory damages. First, the court of appeal found that plaintiffs were only entitled to damages sufficient to restore the soil to regulatory compliance, not to the original condition of the land. Second, the court of appeal affirmed the trial court's finding that the groundwater underneath plaintiffs' property was a Groundwater Classification III aquifer, making the provisions of the Groundwater Act inapplicable. Accordingly, the court of appeal rejected plaintiffs' $200,000,000 claim for damages for groundwater remediation under the Groundwater Act and further found that, although the confined aquifer was contaminated and may need some remediation, the plaintiffs failed to prove the cost or method of remediation for a Groundwater III aquifer.[10]
We granted Exxon's writ application, which assigned as error that the lower courts (1) committed legal error in holding that plaintiffs' claims survived prescription under contra non valentem; (2) erred in awarding punitive damages under repealed Civil Code article 2315.3, and (3) erred in allowing the Breauxs to sue for property damage that occurred before they bought the land. Marin v. Exxon Mobil Corp., 09-2368 (La.2/26/10), 28 So.3d 262. We granted plaintiffs' writ application to consider whether Exxon has an obligation to restore the soil to its original condition as existed at the time the leases were executed and whether Exxon is liable for damages for remediation of the groundwater. Marin v. Exxon Mobil Corp., 09-2371 (La.2/26/10), 28 So.3d 262. The writs were consolidated.

DISCUSSION

Prescription

Contra non valentem
Exxon urges that plaintiffs' tort claims have prescribed because plaintiffs were aware that the pits were contaminated and sugarcane would not grow on the area around the pits sites by at least 1991, yet they did not file suit until 2003.
"Delictual actions are subject to a liberative prescription of one year" and for damage caused to immovable property, "the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." La. C.C. arts. 3492, 3493. A trial court's findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard of review. London Towne Condominium *245 Homeowner's Ass'n v. London Towne Co., 06-401 (La.10/17/06), 939 So.2d 1227, 1231.
Although La. C.C. art. 3467 provides that "prescription runs against all persons unless exception is established by legislation," this Court has applied the jurisprudential doctrine of contra non valentem as an exception to this statutory rule. We have recognized four factual situations in which contra non valentem prevents the running of liberative prescription:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
(2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
(4) where the cause of action is neither known nor reasonably knowable by the plaintiff even though plaintiff's ignorance is not induced by the defendant.
Plaquemines Parish Com'n Council v. Delta Development Co., Inc., 502 So.2d 1034 (La.1987). In cases involving property damage, the fourth category of contra non valentem, otherwise known as the "discovery rule," is encompassed in the prescriptive period proscribed by La. C.C. art. 3493, as both essentially suspend prescription until the plaintiff knew, or reasonably should have known of the damage.[11] While the contra non valentem "discovery rule" is only to be applied in extreme circumstances, and prescriptive statutes are to be interpreted broadly in favor of maintaining a party's claim, the substantive analysis is the same under both La. C.C. art. 3493 and the discovery rule of contra non valentem.
Here, both lower courts found plaintiffs' claims had not prescribed based on the discovery rule, finding the average person would have no way of knowing whether an oilfield pit was properly cleaned because contaminants are not readily discernable by visual inspection and the plaintiffs reasonably relied on Exxon's assurances that the pits were cleaned to the applicable state standards. The lower courts recognized that although plaintiffs had some knowledge of problems with the pits, prescription did not begin to run until they "gained knowledge of the nature and extent of the damages as set forth in the initial report of their expert, Greg Miller." Marin v. Exxon, Slip Op. at p. 12, 2009 WL 7004332. The trial court went further and found that "prescription does not begin to run until the plaintiffs had full knowledge of the extent of damage" as reported by Miller.
The lower courts have interpreted the fourth category of contra non valentem too broadly. As we have stated, "the doctrine of contra non valentem only applies in `exceptional circumstances.'" Renfroe v. State ex rel. Dept. of Transp. and Development, 01-1646 (La.2/26/02), 809 So.2d 947, 953 (citing La. C.C. art. 3467, Official Revision Comment (d); State Through Div. of Admin. v. McInnis Bros. Const., 97-0742 (La.10/21/97), 701 So.2d 937, 940). When this jurisprudential doctrine *246 was first recognized, "we specifically clarified that `[t]his principle will not exempt the plaintiff's claim from the running of prescription if his ignorance is attributable to his own wilfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." Id. (Citing Corsey, supra at 1322 (citing Cartwright v. Chrysler Corp., 255 La. 597, 598, 232 So.2d 285 (1970); Sumerall v. St. Paul Fire & Marine Ins. Co., 366 So.2d 213 (La.App. 2 Cir.1978))); see also Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960, 964 ("prescription does not begin to run until the plaintiff knows sufficient facts and has a reasonable basis for filing suit against a certain defendant . . . [i]gnorance or misunderstanding of the probable extent or duration of injuries materially differs from ignorance of actionable harm which delays commencement of prescription"). Further, "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, . . . even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992) (internal cites omitted).
Specifically regarding property damage claims, knowledge sufficient to start the running of prescription "is the acquisition of sufficient information, which, if pursued, will lead to the true condition of things." Young v. International Paper Co., 179 La. 803, 155 So. 231 (La.1934). This date has been found to be the date the damage becomes apparent. South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 532 (La.1982) ("Generally, the prescriptive period for damage to adjacent land commences when the damage becomes apparent and the injured party discovers who or what caused it"); Dean v. Hercules, 328 So.2d 69 (La.1976) ("[D]amages from industrial emissions and the like may not became apparent until some years after the occurrence . . . [a]dditionally, it might be impossible for the injured party to know what or who caused the damage, until an investigation can be made after the damage in fact becomes apparent"); Yiannapoloulos, Louisiana Civil Law Treatise: Predial Servitudes, Vol. 4, § 63 (discussing obligations of vicinage) ("In accordance with Article 3493 of the Civil Code, prescription begins to run from the day the injured party acquired, or should have acquired, knowledge of the injury and other pertinent facts, namely, from the day the damage becomes apparent.").[12] In addition, the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct. Campo v. Correa, supra at 511; Griffin v. Kinberger, 507 So.2d 821 (La.1987).
*247 Breaux's testimony, both at trial and at his deposition, along with other evidence, reveals the extent of plaintiffs' knowledge. At least by the 1980's, plaintiffs knew that sugarcane would not grow in areas surrounding the pits. On September 23, 1987, Breaux, as "speaker for landowners," met with Exxon's representative and told him that he was aware that Exxon had been dumping in the pits for 40 years and the landowners "want every bit of contamination removed from the site and new dirt hauled in." Breaux knew that he "had something in the field that wouldn't allow us to grow cane in spots" but "didn't know what it was." Breaux knew from his experience working in the oilfield that open pits had barite (drilling mud) in them. Exxon's representative told Breaux that Exxon would stockpile the contaminated material from the pits on the site, backfill the pits with clean fill material, test the stockpiled material and discuss the results with him. Breaux knew that Exxon's pit cleaning process consisted of taking out the sludge, spreading it out on other land, drying it out, mixing it with virgin soil and putting it back in the pit. Breaux also testified he used to work for Exxon delivering fuel and he knew Exxon was cleaning and storing pipe on a 20 acre field in the Marin property. He knew from his experience that pipe cleaning deposited NORM "radiation" and other elements that could be dangerous to humans and he saw Exxon dumping other material in that area.
Between 1987 and 1991, either because of Breaux's complaints or because of Statewide Order 29-B, Exxon ceased using its remaining pits, and closed them after purportedly remediating them to the appropriate statewide standards. In connection with these activities, Exxon hired Bayou Sale Contractors to perform pit closure work. Breaux testified that in September of 1988, he saw Stanley Boudreaux, Bayou Sale Contractors' employee, covering up a pit on the Marin Property. This pit was the biggest pit on either the Marin or Breaux properties. Breaux noticed that the pit still had sludge in the bottom of it and asked the Exxon supervisor to have the operations stopped because of the remaining sludge. Later, Exxon closed the pits with the remaining sludge still there, telling Breaux that they could not solve the problem and that it would cost too much to clean it up. Breaux testified that he and Engsfeld Marin went to the bottom of the pit 15-20 feet deep and scooped up some of the sludge and put the sludge in two canning jars in his shed, because "now if they don't close the pit up or if they cover this up, I can at least show somebody what's in the bottom of it." Engsfeld Marin testified that they took the samples because they knew the contamination was going to "come back up." He also testified that he didn't file suit for 20 years because he couldn't find a lawyer. Exxon told Breaux they had to have the pits cleaned by 1989 so they were going to come back and do it legally, and that he should to try and grow cane on the area.
At some point thereafter, but prior to 1991, Breaux complained that his tractor had sunk into a closed pit area on his land and requested that Exxon remedy that problem. After a second attempt to remediate the pits in 1991 by Tetra Resources, Inc., Mike Hluza of Exxon sent Breaux a letter on April 4, 1991 attaching the results of tests from James Laboratory which Hluza represented showed that all parameters, including salt, were well below accepted standards and state regulations. At trial, Breaux testified he "had to believe that Exxon didn't lie, and if they told me it was in full compliance, I had to believe them." In his deposition, he testified he questioned those results when he received them because he was suspicious of where they took the samples.
*248 After the pits on the Breaux property were closed, Exxon instructed Breaux that in order to have his land returned to him for farming he would have to sign a release. The release, signed on September 4, 1991, provided:
In consideration of the sum of Ten and No/100Dollars ($10.00) and other good and valuable consideration and benefit given to the undersigned by Exxon Corporation, receipt and sufficiency of which are hereby acknowledged, the undersigned hereby release and discharge in full the said corporation, its officers, agents, contractors, employees, successors, and assigns, from all claims, demands, or causes of action arising from or growing out of all injuries and damages of every character and description sustained by the undersigned personally or to property of undersigned, whether now apparent or known to undersigned or which may hereafter develop, as the result of: drilling pit closures and restoration at the site of Canal Bank and Trust Co. Nos. 4 and 7 well locations at or near South Bend, LA in the Bayou Sale Field on or before September 1, 1991 . . .
That the said sum is accepted by the undersigned in full settlement and discharge of all claims of whatsoever kind or character the undersigned may have against the above mentioned parties, and furthermore, said sum was agreed upon as a compromise settlement of a disputed claim and is not an admission of liability by the above mentioned parties.[13]
Breaux testified that he only agreed to sign the release after being assured by Exxon that he was not waiving any environmental claims and the remediation of his property was compatible with applicable statewide standards.
Thus, the evidence is clear that plaintiffs knew by 1991 that sugarcane would not grow properly in the pit areas and had made demand on Exxon to clean and close the pits so that they could grow sugarcane. They knew that some of the pits were closed with sludge remaining at the bottom of the pits after the first attempt at closure, and they kept samples of the contents of this sludge. They knew that the pits contained some oilfield wastes (barites/drilling mud). They knew that certain of the pit areas were not stable enough to support farm equipment. They knew that Exxon was having trouble cleaning and closing the pits sufficiently to meet the applicable statewide standards. Although Exxon assured plaintiffs that they were in compliance in 1991, they remained suspicious of Exxon's assurances that the pits were remediated to statewide regulatory standards. After the attempted remediation in 1991, plaintiffs had the opportunity to observe that a healthy sugarcane crop was still not growing in spite of Exxon's efforts. Further, no new damage became apparent that was not already apparent in 1991; in fact, the pit areas still will not support healthy cane growth.
Thus, under the applicable law, the question is whether knowledge of these facts constitutes "the acquisition of sufficient information, which, if pursued, will lead to the true condition of things." Young, supra. Put another way, should the knowledge of these facts have put the plaintiffs on notice that further inquiry and investigation was necessary, and would further inquiry have led to knowledge that the land was contaminated with oilfield wastes? As plaintiffs took no further action upon learning that sugarcane would *249 not grow in certain areas, that something in the soil was causing the sugarcane not to grow, and that Exxon was responsible for this damage, was their inaction reasonable in light of their education, intelligence, and the nature of the defendant's conduct? To be sure, a layperson could not have discovered the type of contamination on plaintiffs' property without the assistance of an expert; thus, the question is whether plaintiffs should have hired an expert, or taken the soil and/or groundwater to a laboratory for testing, based on the knowledge they had in 1991, or based on knowledge they had several years later that the cane still would not grow, or whether it was reasonable to wait until 2003 to do so.
We recently discussed the constructive knowledge requirement in a soil and groundwater contamination case in Hogg v. Chevron USA, Inc., 09-2632 c/w 09-2635 (La.7/6/10), 45 So.3d 991. There, although damage was not apparent on plaintiffs' property, they received two letters from the DEQ informing them that leaking underground storage tanks at a neighboring Chevron station had contaminated the subsurface soil and groundwater in the area, that the direction of groundwater flow was toward plaintiffs' property, that water samples taken from a stream on the plaintiffs' property contained gasoline constituents, and that gasoline constituents had been detected on the property in such concentrations that it was recommended that plaintiffs limit the time spent in the area. The plaintiffs did not file suit until five years later upon receiving a letter from a company with which LDEQ had contracted seeking permission to enter their property to conduct remediation. Plaintiffs contended that the letters from the LDEQ provided no definitive evidence of contamination or whether the contamination exceeded allowable limits and that the information was vague and indicated the investigation was ongoing. Therefore, they argued it was reasonable for them to await further notice before taking action. We rejected this argument, finding that although the letters may not have specifically informed plaintiffs that their property was contaminated, it was "beyond peradventure that [the letters] provide[d] sufficient information to excite attention and put plaintiffs on guard and call for inquiry." 45 So.3d at 1001. We pointed out case law establishing that prescription runs from the date a person "first suffers actual and appreciable damages, even though he may thereafter come to a more precise realization of the damages he has incurred or incur further damage as a result of the completed tortious act," Id. (Citing Harvey v. Dixie Graphics, Inc., supra). And, we stressed that "[w]hile prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to seek out those whom he believes may be responsible for a specific injury." Id., 45 So.3d at 1001 (citing Jordan v. Employee Transfer Corp., 509 So.2d 420, 423 (La.1987)). The fact that the allegations in the plaintiffs' 2007 petition for damages were based on the same information contained in the 2001 and 2002 letters was important to our finding that the letters gave the plaintiffs sufficient knowledge to afford them a reasonable basis to pursue a claim for damages and that their inaction, in light of these letters, was unreasonable. Id., 45 So.3d at 1001.
While the information contained in these letters is far more detailed than the information the Marins and Breauxs had, they had knowledge of damage that was apparent, i.e., dying sugarcane. Even though *250 the damage they discovered later was more extensive, the sugarcane damage was an outward sign of "actual and appreciable damage," and was sufficient information to excite attention and put plaintiffs on guard and call for inquiry. We acknowledge that sugarcane takes some time to grow and by 1991, they would not have known whether the attempts at remediation were successful. In fact, Breaux testified it would take about 4 years to know if the sugarcane was going to be healthy. However, Breaux also testified that the sugarcane never did grow in some of the pit areas and has still not grown there today. We find that at least by 1995, plaintiffs had sufficient information to excite their attention and they should have investigated further at that time. Therefore, it was unreasonable to wait until 2003 to file suit. Just as in Hogg, it is important to note that the allegations of their petition are based on the same facts that they could have discovered had they investigated in 1991 or 1995. No additional damage became apparent or occurred to excite their inquiry in 2003 so as to end the suspension of prescription under the discovery rule. While the 2003 Corbello decision increased the value for oilfield contamination damages in certain cases, plaintiffs could have recovered for their property damage before Corbello, and, in any event, a new development in the jurisprudence is not the type of notice we have ever applied to find that the suspension of prescription has ended under the discovery rule.
Here, the trial court relied on Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp., 02-266 (La.App. 3 Cir. 4/2/03), 844 So.2d 380, writs denied, 03-1585, 03-1624 (La.10/31/03), 857 So.2d 476, to hold that "the doctrine of contra non valentem applies to this case and prescription does not begin to run until the plaintiffs had full knowledge of the extent of damage as reported by the initial report of Greg Miller, plaintiff's expert." The court of appeal found no manifest error in this ruling. Marin v. Exxon, Slip Op. at p. 12, 2009 WL 7004332. However, the lower courts committed an error of law based on the above jurisprudence. Under the fourth category of contra non valentem, prescription is not interrupted/suspended until a plaintiff has "full knowledge of the extent of damage." Prescription begins to run when the plaintiff should have acquired knowledge of the damage to their property. Further, as stated above, "prescription runs from the date on which [a plaintiff] first suffered actual and appreciable damage, . . . even though he may thereafter come to a more precise realization of the damages he has already incurred or incur further damage as a result of the completed tortious act." Harvey, supra at 354.[14] As stated earlier, assuming it *251 takes 4 years to determine if a sugarcane crop will be healthy, based on the information the plaintiffs had acquired by at least 1995, they should have taken further steps to learn the true nature of the damage to their property. If fact, although the contamination may have been invisible and odorless, its effects were not and plaintiffs' lawsuit was premised on exactly the same conditions that they complained about in the early 1990s. Had they hired an expert at that time, they would have learned extent of the contamination, just as they learned in 2003. The fact that it may take an expert to determine the extent of damage in an oilfield contamination case does not prolong the prescriptive period until an expert is actually hired and has performed his testing. Thus, while plaintiffs were not required to file suit at the earliest possible indication that their land was contaminated, to wait eight years after their attempts to grow sugarcane would have succeeded had Exxon properly remediated the property was unreasonable, even in light of Exxon's misrepresentations that the soil was no longer contaminated. The fourth category of contra non valentem does not save their tort claims from prescribing.[15]
The First Circuit additionally found that the third category of contra non valentem applied to prevent prescription from running. This category encompasses the situation where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action. Corsey, supra at 1321-22. This category has been applied to cases wherein defendant has concealed the fact of the offense or has committed acts (including concealment, fraud, misrepresentation, or other "ill practices") which tend to hinder, impede, or prevent *252 the plaintiff from asserting his cause of action, as long as plaintiffs delay in bringing suit is not willful or the result of his own negligence. Nathan v. Carter, 372 So.2d 560, 562 (La.1979). In Nathan, this Court applied the doctrine where the defendant had "lull[ed] [the plaintiffs] into a false security." Id. at 563. Likewise, based on the trial court's findings that "plaintiffs detrimentally relied on documents supplied to them by Exxon representing that the remediation was complete and that the pits were cleaned to applicable standard and `parameters, including salts,'" the court of appeal found that these "assurances were sufficient to constitute a `lulling' as contemplated under the contra non valentem jurisprudence." Marin v. Exxon, Slip Op. at p. 13, 2009 WL 7004332.
We find the First Circuit erred in applying the third category of contra non valentem because more is needed to invoke that doctrine. This category is implicated only when (1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud or ill practice, Fontenot, supra at 963; (2) the defendant's actions effectually prevented the plaintiff from pursuing a cause of action, Hendrick v. ABC Ins. Co., 00-2403, 00-2349 (La.5/15/01), 787 So.2d 283, 290, 293; and (3) the plaintiff must have been reasonable in his or her inaction, Jordan, supra at 423. See also Allstate Ins. Co. v. Fred's Inc., 09-2275 (La.1/29/10), 25 So.3d 821 (granting writ and holding that where the manufacturer failed to identify itself as the manufacturer on the label of its product, the court of appeal erred in holding that the third and fourth categories of contra non valentem applied because the plaintiff's lack of due diligence to ascertain the identity of the manufacturer precluded the application of contra non valentem).
In this case, plaintiffs argue that not only did Exxon represent to plaintiffs that their 1991 remediation was successful, but in both 1993 and 2001, Exxon conducted assessments of the land for internal purposes and did not tell plaintiffs that these assessments indicated that the land was in fact contaminated beyond allowable standards. After receiving the 1993 report, Exxon decided that "we would have Mr. Breaux inform us when his final year was and we would go in and take care of the situation . . . I know that was our intent," evidencing Exxon's intent to wait until some future event, which according to plaintiffs was the final year of Breaux's four-year crop rotation, to repair any contamination. Further, throughout this time period, Exxon was responsive to plaintiffs' concerns regarding the sugarcane and even paid them to compensate them for their sugarcane losses, all the while knowing that the land was contaminated beyond regulatory standards. We find that this conduct, while less than acceptable, does not meet the requirements necessary under the third category of contra non valentem. In the context of "lulling," while Exxon may have preferred the plaintiffs not file any type of lawsuit, Exxon was certainly not trying to prevent plaintiffs from filing a multi-million dollar Corbello-type suit as Louisiana courts had yet to recognize such damages. Further, plaintiffs had little reason to sue as they were being compensated for their losses in the form of sugarcane damages and that was their chief concern. While Exxon misled plaintiffs by not disclosing the extent of the contamination when they learned of it, they certainly did nothing to prevent plaintiffs from investigating the cause of the sugarcane loss for themselves. Further, while it may have been reasonable to wait a few years after 1991 to sue, it was unreasonable for plaintiffs to wait 12 years thinking that Exxon was going to come *253 back and fix any damage on those particular pits. The pits had been closed, releases had been signed, and the sugarcane still would not grow. See Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, 731 (rejecting application of third category based on landowner's claims that defendant assured her they would remedy the problem.). The third category of contra non valentem does not apply here.

Continuing tort
In the alternative, plaintiffs argue their delictual actions are not prescribed because Exxon's pollution of their land constitutes a continuing tort upon which prescription does not begin to run, regardless of their knowledge of the damage, until the contamination is removed from their property. Plaintiffs claim that Exxon's pollution continues to migrate causing successive, ongoing and cumulatively increasing deterioration of their property. Exxon argues that for the continuous tort doctrine to apply, the operating cause of the injury must be a continuous one, and that where the damage-causing conduct ceases, the tort is no longer continuing. Here, Exxon argues that the damage-causing conduct was the deposit of the oilfield waste into the unlined pits, and this conduct ceased by at least 1989, more than a decade before suit was filed.
After this case was argued, we issued our opinion in Hogg, supra, which fully explained the parameters of the continuous tort doctrine. In Hogg, plaintiffs' land was contaminated as a result of the migration of gasoline from formerly leaking underground storage tanks located on neighboring property. At the time of suit, the gasoline remained on the property, but the cause of the contamination, i.e., leaking underground storage tanks, had been removed ten years prior. The Hoggs argued that the presence of the gasoline on their property constituted a continuing trespass and, as a result, prescription would not begin to run until the trespass was abated by the removal of the gasoline from the property. We disagreed.
After discussing the law relevant to continuous torts, see 45 So.3d at 1002-1003, we set out the following test to be used in making this determination: "the court must look to the operating cause of the injury sued upon and determine whether it is a continuous one giving rise to successive damages, or whether it is discontinuous and terminates, even though the damage persists and may progressively worsen." 45 So.3d at 1003. Relying on our prior opinion in South Central Bell, supra, we held that the operating cause of the damages was the leaking underground storage tanks and that when the tanks were replaced and thus the leaking stopped, prescription began to run. We likewise cited our opinion in Crump, supra, wherein we held that "[a] continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act." In Crump, the digging of a canal caused the continuing diversion of water from an ox-bow lake on plaintiff's property, and we held that the continued presence of the canal and the consequent diversion of water from the ox-bow were "simply the continuing ill effects arising from a single tortious act." 737 So.2d at 728. Likewise, we held in Hogg that "[a]s in Crump, the presence of the gasoline in the soil and subsurface is simply the continued ill effect of the original tortious incidentthe leaking of gasoline, which ceased in 1997 when the tanks were replaced." 45 So.3d at 1006.
In Hogg, we also rejected the plaintiffs' argument that the failure to contain or properly remediate the leakage constituted a continuing wrong as the failure to remediate was not the operating cause of *254 their damage, the leakage was. 45 So.3d at 1007. We relied on Crump's holding that "the breach of a duty to right an initial wrong simply cannot be a continuing wrong that suspends the running of prescription, as that is the purpose of every lawsuit and the obligation of every tortfeasor." Id. (citing Crump, supra at 729).
Arguably, one difference between this case and the Hogg case is that in Hogg, there was no evidence or argument that gasoline continued to leak after the tanks were replaced, whereas here, plaintiffs assert that "the evidence shows that Exxon's pollution continues to (1) migrate, (2) cause successive damage, and (3) cause ongoing and cumulatively increasing deterioration of Plaintiff's property." However, evidence of any seeping or migration was scant at trial as this was not a heavily litigated factual issue. The evidence cited for this proposition was testimony from plaintiffs' expert, Greg Miller, relating to groundwater contamination. He testified as follows:
Q. An the groundwater that we talked about, and you talked about the depth, will this stuff just stop migrating, or will it continue to migrate laterally and vertically?
A. It will continue to migrate. And there's reallyall of the data that I've looked at shows just this great thickness of silt and the dynamics of constantly changing groundwater flow. There's really nothing that I've seen that would prevent continued migration of the groundwater plumes. And, matter of fact, it's obvious from those ribbon plats we looked at earlier that you've got a mass of contamination in the soil that's going to continue to dissolve into the groundwater. So, in essence, if you don't get the source of the contamination, the contaminated soil, if you don't do something with that it's going to continue to dissolve into the groundwater and continue to migrate. So, in essence, your plumes are going to continue to grow. It's pretty fundamental dynamics of groundwater contamination.
However, this scant evidence does not change our view that Exxon's conduct does not constitute a continuing tort. The operating cause of plaintiffs' injury was still the actual disposal or storage of the oilfield waste in unlined pits on plaintiffs' property. See Lejeune Bros., Inc. v. Goodrich Petroleum Co., L.L.C., 06-1557 (La.App. 3 Cir. 11/28/07), 981 So.2d 23, writ denied, 08-298 (La.4/4/08), 978 So.2d 327, and Mouton v. State of Louisiana, 525 So.2d 1136 (La.App. 1 Cir.1988), writ denied, 526 So.2d 1112 (La.1988) (both holding that the operating cause of plaintiffs' injury was the disposal or storage of oilfield waste in plaintiffs' property even though the damage caused by this conduct was continuous). When the pits were closed, the conduct ceased. Simply because the contaminants may have continued to dissolve into, or move with, the groundwater with the passage of time does not turn this into a continuing tort. As we held in In re Medical Review Panel for Claim of Moses, 00-2643 (La.5/25/01), 788 So.2d 1173, 1183, "[w]hen a defendant's damage-causing act is completed, the existence of continuing damages to the plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort." Any continued dissolution into the groundwater is the continuation of the harm caused by the previous, but terminated conduct, and falls under the category of "progressively worsening damages," not damage-causing conduct. Further, this migration is distinguishable from the leaking underground storage tanks in South Central Bell Telephone and Hogg, because in those cases, the damage-causing *255 conduct was the actual leaking of the tanks, not the storage of the gasoline in the tanks, which would have caused no damage whatsoever but for the leak. Here, the damage-causing conduct was the deposit and/or storage of the oilfield waste in unlined pits, which conduct terminated by at least 1989.
Accordingly, we find that the operating cause of the injury sued upon was the deposit and storage of oilfield wastes into unlined pits which conduct terminated when the pits were closed. Any dissolution of this contamination unto and into plaintiffs' property is the resulting damage of the damage-causing conduct, and does not give rise to a continuing tort pursuant to our previous holdings. Therefore, we hold that plaintiffs' delictual actions have prescribed.

Leases in effect
Regarding the contract claims, the Marin Lease and the Surface Lease, as novated, were still in effect at the time of trial. The CBT Lease, under which the Breaux's purport to sue, was not in effect at the time of trial. Plaintiffs argue that as a lessee, Exxon has continuing obligations under both the mineral and surface lease that cannot prescribe as a matter of law. Exxon argues that any restoration obligations it may have under these leases do not go into effect until the lease is terminated, making any such claims premature. The plaintiffs' position is correct.
A lessee's obligations under a mineral lease are governed by the Mineral Code and the Louisiana Civil Code. La. R.S. 31:2 (providing that the provisions of the Mineral Code are supplementary to the Civil Code and when the Mineral Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable).
La. R.S. 31:122 provides:
A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.
The Civil Code lease provisions require the mineral lessee to perform certain restoration obligations during the lease term, and these obligations are governed by Civil Code articles 2683, 2686, 2687, and 2692.[16] La. C.C. art. 2683[17] defines the lessee's principal obligations as follows:
The lessee is bound:
(1) To pay the rent in accordance with the agreed terms;

*256 (2) To use the thing as a prudent administrator and in accordance with the purpose for which it was leased; and
(3) To return the thing at the end of the lease in a condition that is the same as it was when the thing was delivered to him, except for normal wear and tear or as otherwise provided hereafter.
La. C.C. art. 2686 provides "[i]f the lessee uses the thing for a purpose other than that for which it was leased or in a manner that may cause damage to the thing, the lessor may obtain injunctive relief, dissolution of the lease, and any damages he may have sustained." La. C.C. art. 2687 directs that "[t]he lessee is liable for damage to the thing caused by his fault or that of a person who, with his consent, is on the premises or uses the thing." Finally, La. C.C. art. 2692 provides "[t]he lessee is bound to repair damage to the thing caused by his fault . . . and to repair any deterioration resulting from his . . . use to the extent it exceeds the normal or agreed use of the thing."
While La. C.C. art. 2683 contains obligations that only arise at the end of the lease, i.e., "to return the thing at the end of the lease in a condition . . .," there is absolutely no language to suggest that the other obligations imposed by these codal provisions are not operational until termination of the lease. These provisions continue throughout the term of the lease and a lessor need not wait until the end of the lease to sue a lessee for damage to his property. The damage in this case is the contamination of the soil and groundwater caused by Exxon's oil and gas operations on the leased property. Because the Marin Lease and the Surface Lease as novated were still in effect at the time of trial, the Marin plaintiffs' claims for damage to their property have not prescribed.
The situation with the Breaux plaintiffs is different. Although it is unclear when the CBT Lease expired, the parties in brief indicate that this lease is no longer in effect and was not in effect at the time the suit was filed. It evidently was in effect at the time the Breauxs purchased their property, but there has been no evidence presented that the Breauxs were third party beneficiaries of the CBT Lease. Further, even assuming the Breauxs had a right to sue Exxon under the lease, this contractual action has prescribed. The prescriptive period on a personal action, such as an action for breach of a lease contract, is 10 years. La. C.C. art. 3499. As this contract claim has prescribed on its face, plaintiffs had the burden of proving it had not prescribed, and they failed to do so.[18]

Punitive Damages
Because plaintiffs' tort claims have prescribed, they are not entitled to punitive damages under former Article 2315.3. Corbello, supra at 708 (damages under 2315.5 are recoverable on a derivative basis where a plaintiff is entitled to recover tort damages, not for breach of contract claims).

Compensatory Damages
The damages that remain intact under the above rulings are the following compensatory *257 damages awarded by the trial court to the Marin plaintiffs: $15,115,390.65 for soil excavation; $3,481,317.62 for the management of groundwater during the excavation; and $2,408,868 for canal contamination. These amounts were found by the trial court to be the amounts required to restore the property to 29B standards. As Exxon has not assigned as error the validity of these amounts, we need not delve into the specifics of these awards as testified to by numerous experts.
On the other hand, plaintiffs argue the compensatory awards were too low, and should have been based on the amount necessary to restore the land to its original condition, as existed at the time the parties entered into the leases, not merely an amount sufficient to restore the land to statewide regulatory standards. They base this argument on Terrebonne Parish School Bd. v. Castex Energy, Inc., 04-0968 (La.1/19/05), 893 So.2d 789, 801, wherein this Court held that "in the absence of an express lease provision, Mineral Code article 122 does not impose an implied duty to restore the surface to its original, pre-lease condition absent proof that the lessee has exercised his rights under the lease unreasonably or excessively."[19] In Castex, the lessor specifically consented to the dredging of canals; therefore, the canals were considered normal wear and tear on the lessor's property which the lessee was not deemed responsible. Plaintiffs argue that Exxon owes true restoration damages because it was "unreasonable and excessive" in its use of plaintiffs' land.
Plaintiffs also argue that the express terms of the Surface Lease require that the property be restored to its original condition. Addressing this argument first, we note that the Marin Lease (the mineral lease) did not contain any restoration provisions. The Surface Lease, entered into on August 5, 1941, between E.F. Marin and Humble granted to Humble "a servitude and right to the use of the surface of the land [therein described] for any and all purposes which Humble Oil . . . may deem necessary or advantageous in connection with its business ..." This servitude covered approximately 20 acres that was used to build a landing/dock area, terminal and related facilities for the production of oil and gas. This 1941 servitude also provided that "in no case shall Humble Oil . . ., its successors and assigns, be obligated to remove such property or to restore the premises to the condition in which they now are but may abandon and surrender the same in the condition in which they may be at such time and shall not be liable in any manner for damages to said land caused by its use of said premises." On May 18, 1994, the Marins and Exxon entered into an agreement regarding this surface area which was "intended to be a novation" of the 1941 servitude. The 1994 *258 novation provided that "LESSEE shall restore the leased premises as near as reasonably practicable to its present condition and shall be liable for any damage to the surface of the land by reason of LESSEE's use during the term of this Lease. . ." Further, the novation provided that Exxon would not violate any governmental rules pertaining to the pollution and contamination of the land or water and that Exxon would indemnify the Marins for any environmental claims against them. Finally, the novation gave the Marins the right to terminate the lease upon violation of any environmental laws that was not corrected upon demand. The Surface Lease was amended in 2001, adding Tract 2 (on which the big Marin pits were located) and increasing the rent by $600 per month. In addition, the 2001 amended provided:
In consideration of this increase and other good and valuable consideration given to the LESSORS by Exxon . . ., the LESSORS hereby release and discharge in full Exxon . . . from all claims, demands, or causes of action arising from or growing out of all injuries and damages of every character and description sustained by the LESSORS personally or to property of the Lessors, whether now apparent or known to the LESSORS or which may hereafter develop, as the result of any and all damages to sugar cane crops resulting from prior use by Exxon . . . on Tract 2. Additionally, that the said consideration is accepted by the Lessors in full settlement and discharge of all claims of whatsoever kind or character the Lessors may have against the above mentioned parties, and furthermore, said consideration was agreed upon as a compromise settlement of a disputed claim and is not an admission of liability by the above mentioned parties.
The trial court accepted this as a settlement of the Marin's sugar cane crop loss, and not as a settlement of any environmental claims, and found any release obtained by Exxon was obtained as a result of fraud and misrepresentation.[20] The Marins argue that the provision in the 1994 novation requiring that "LESSEE shall restore the leased premises as near as reasonably practicable to its present condition and shall be liable for any damage to the surface of the land by reason of LESSEE's use" is an express contractual term requiring Exxon to restore the land covered by the Surface Lease, including the big Marin pits, to the pre-1941 condition.
"Contracts have the effect of law for the parties" and the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. arts. 1983 and 2045. In Corbello, supra, this Court held that the following surface lease provision obligated the lessee to restore the property to its pre-lease condition:
Lessee agrees to indemnify and hold lessor harmless from any and all loss, damage, injury and liability of every kind and nature that may be caused by its operations or result from the exercise of the rights or privileges herein granted. Lessee further agrees that upon termination of this lease it will reasonably restore the premises as nearly as possible to their present condition.
While the above provision and the provision in the 1994 novation of the Surface Lease are similar, the "present condition" in the Corbello surface lease was the condition of the property at the time the lease was entered into, 1961. In the case of the Marin lease, the "present condition" is the condition at the time of the 1994 novation, not the time of the original Surface Lease, *259 1941. A novation "is the extinguishment of an existing obligation by the substitution of a new one." La. C.C. art. 1879. Because of the 1994 novation, the 1941 Surface Lease is extinguished; therefore, the "present condition" language cannot relate back to 1941. Therefore, we reject the Marin plaintiffs' argument that any express lease provisions require restoration to the original 1941 condition.
Next, we address plaintiffs' argument that under Castex that they are entitled to restoration to the original pre-lease condition because Exxon "exercised [its] rights under the lease unreasonably or excessively." Castex, supra at 801. The trial court found that "the continued contamination of the various chemicals documented by [plaintiffs' expert] and deposited by Exxon [on] the Marin and Breaux properties is unreasonable and constitutes negligent operations by the lessee." Both lower courts essentially held that even where unreasonable or excessive use are proven, courts must still take into account normal wear and tear in calculating the appropriate cost for remediation, and that remediation to 29B standards would account for normal wear and tear. However, plaintiffs argue in light of the trial court's finding that Exxon was unreasonable in its operations, the lower courts erred in not awarding the costs of restoration to the original condition under Castex.
Exxon argues that the language regarding unreasonable or excessive use in Castex was dicta because there was no allegation that the lessee had unreasonably or excessively exercised its rights under the lease. Further, there was no effort made in Castex to determine what degree of remediation would be required by a lessee who had used the property unreasonably or excessively. An award sufficient to restore the property to 29B standards would put the plaintiffs in the same position they would have been in but for the breach. Further, under current law as provided by Act 312 of 2006, property must only be remediated to applicable regulatory standards following a site-specific, defendant-funded, court-approved, and court-supervised remediation plan. See La. R.S. 30:29, et seq. The goal of the new legislation is not "perfect restoration," and the reasonableness or unreasonableness of a defendant is not a factor in determining the cleanup standard. Id.
The situation in Castex was somewhat different than the situation we are presented with today. In Castex, the lessee dredged canals through the marshes without backfilling them, which led to significant coastal erosion. Restoring the surface to its original condition would have meant coming back in and filling the canals. In Castex, the dredging of the canals was found to constitute necessary "wear and tear," as the landowners had expressly consented to the dredging. Unlike this case, there was no issue in Castex over how much restoration was required as the wear and tear, i.e., the dredged canals, was obvious, and no regulatory standards were applicable; the issue was simply whether the lessee had a duty to restore at all. In this case, because of the trial court's finding that Exxon conducted its operations unreasonably or excessively, and the certainty that plaintiffs would not have consented to the disposal and storage of oilfield wastes into pits known to be environmentally unsound, there is no doubt that Exxon has a duty to restore, the question is simply to what standard.
In our view, the duty to remediate oilfield contamination exists under the prudent operator standard of the Mineral Code by virtue of our holding in Castex, and it certainly exists under the *260 Civil Code.[21] The holding in Castex merely recognized that in absence of unreasonableness or excessiveness, the lessee has the duty to restore the surface minus normal wear and tear. Where the lessee has operated unreasonably or excessively, as in this case, the lessee has additional obligations, e.g., the obligation to correct the damage due to the unreasonable or excessive operations.[22] However, that does not necessarily mean that the lessee has a duty to restore the land to its pre-lease condition, particularly where, unlike dredged canals, subsurface contamination is not overt and cannot be considered "wear and tear." Castex explained that in determining what constitutes necessary "wear and tear" in a particular case, "it is useful to consider the character of the specific rights granted in the lease" to consider whether the lessor consented to the particular activities. 893 So.2d at 800. The damage caused by Exxon's unreasonable operations was the contamination of the soil, and it is clear plaintiffs did not consent to this contamination. Therefore, Exxon's additional restoration duty is the duty to correct the contamination. The lower courts both correctly recognized this point and held that remediation to 29B standards satisfied the Castex requirements.[23]

Groundwater remediation
Plaintiffs make two arguments in support of their claim that Exxon is liable for groundwater remediation. First, they argue that the Exxon's operations have contaminated a Class II aquifer, and as such, the Groundwater Act applies pursuant to which Exxon must deposit $199,129,592.00 into the registry of the court to be used exclusively to remediate the usable groundwater.[24] Second, they argue that even if the aquifer is a Class III aquifer to which the Groundwater Act does not apply, the groundwater must still be remediated *261 to its "original condition" under Castex. Plaintiffs claim that restoration of groundwater to original condition will cost $199,129,592, and restoration to regulatory compliance will cost $124,716,219.
The Groundwater Act applies to "usable groundwater." La. R.S. 30:2015.1 J(1). In order to qualify as usable groundwater, the groundwater must be classified as a Class II aquifer. "Usable" groundwater is defined as a Groundwater Classification I (an aquifer that is a primary drinking water source or is directly connected with a drinking water source) or a Groundwater Classification II (an aquifer that is an agricultural supply, domestic supply, or any other supply source). La. R.S. 30:2015.1 J(1); La. Dep't of Envtl. Quality RECAP Regulations § 2.10 at 49-51 (Oct. 20, 2003). A Groundwater Classification III aquifer is an aquifer with a maximum sustainable yield of less than 800 gallons per day and is considered non-usable. After considering extensive expert witness testimony, the trial court found that the "groundwater bearing zone beneath the Marin and Breaux properties is a Class III aquifer." In this case, the expert testimony was conflicting, with plaintiffs' experts testifying that it was a Class II aquifer, and defendant's experts testifying it was a Class III aquifer. The trial court accepted the testimony of Dr. David Angle that the aquifer was a Class III aquifer. Dr. Angle testified that, after a review of studies done by plaintiffs' expert, the water bearing zone beneath plaintiffs' property was a confined aquifer that was 24 feet thick, and that the soil was not very permeable. He further testified that plaintiffs' experts pump test established that it was not scientifically possible for the aquifer's maximum sustainable yield to equal or exceed 800 gallons per day and that the well ran dry after 65 minutes. Based on the above, Dr. Angle testified that it was a Class III aquifer. The trial court's reliance on this testimony to find it was a Class III aquifer was not manifestly erroneous. Findings of fact are subject to the manifest error standard of review, and where the finder of fact credited one witness's testimony over another, that finding can never be manifestly wrong.

London Towne Condominium Homeowner's Ass'n, supra.

The trial court further found that even though the contained aquifer underneath plaintiffs' property was contaminated and some remediation may be warranted, the plaintiffs failed to prove the necessary remediation to be performed on a Class III aquifer or the costs of such remediation. The court of appeal affirmed the trial court's findings regarding the groundwater claim.
Plaintiffs' expert testified that the concerns with a Class III aquifer were the effects of the contamination on the nearest receiving water and that subsurface soil contamination was the source of the groundwater contamination. The trial court already awarded plaintiffs $2,408,868 for contamination of the canal. Further, if the soil contamination is remediated, presumably the source of the groundwater contamination will be removed. In addition, witnesses testified that there are no written DNR groundwater remediation standards for non-drinkable groundwater. Austin Arabie, plaintiffs' expert on this subject, did not testify regarding cleanup of a Class III aquifer, nor the costs associated with such cleanup. In our view, it seems illogical to award the landowner money to remediate unusable groundwater, with no oversight by the DNR, when the statute enacted to classify and protect groundwater does not require a cleanup. Further, it is unclear from the record *262 what additional damage this contaminated groundwater caused, beyond what was caused by the contaminated soil. Accordingly, we affirm the lower courts' rulings that plaintiffs are not entitled to damages for remediation of this Class III aquifer.[25]

CONCLUSION
In this oilfield contamination case, we find that the plaintiffs' tort claims against Exxon have prescribed because they did not file suit within one year of the date they should have known of the damage to their property. Damage became apparent when they were unable to grow sugarcane on certain areas around the former pits after Exxon closed, and purportedly remediated, the pits in 1991. As they knew Exxon's activities were contaminating their land and sugarcane still would not grow despite Exxon's 1991 remediation attempts, they were put on notice that further investigation was necessary, even though they did not know the full extent of the contamination at that time. Further, while Exxon misled them about the extent of the contamination, Exxon did nothing to prevent them from finding out the full extent of the damage and filing suit. While plaintiffs were not required to file suit at the first possible indication that they had suffered some wrong, it was unreasonable to wait so many years to investigate the problem and file suit, particularly where the only thing that finally put them on notice to investigate was this Court's recognition of the value of oilfield contamination damages in another case. Therefore, the lower courts erred in finding that prescription on a claim for oilfield contamination remediation damages does not begin to run until a landowner receives notice of the full extent of his damages in the form of an expert's report. Further, the contamination in this case does not constitute a continuing tort as the damage-causing conduct was the disposal and storage of oilfield waste in unlined pits and the discharge of this waste into a freshwater environment, which conduct stopped by at latest 1989. The continuous presence of this waste in the subsoil is the continuation of the ill effects of the damage-causing act.
As plaintiffs' tort claims have prescribed, they are not entitled to punitive damages. However, the Marins are entitled to compensatory damages for breach of existing leases on their property. The trial court's award of the amount necessary to restore the land to regulatory standards, rather than to its original condition, is appropriate. Further, the trial court's finding that the groundwater beneath the plaintiffs' property is not a Class I or II aquifer was not manifestly erroneous and therefore, Exxon is not liable for cleanup under the Groundwater Act. Finally, plaintiffs did not prove they were entitled to damages for contamination of an unusable aquifer, nor the amount that would be necessary and appropriate to clean an unusable aquifer. Therefore, plaintiffs are not entitled to damages for groundwater remediation.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed in part and affirmed in part and the matter is remanded to the trial court to enter an order consistent with this opinion.
REVERSED IN PART; AFFIRMED IN PART; REMANDED.
*263 JOHNSON, J., dissents in part and concurs in part for reasons assigned by KNOLL, J.
KNOLL, J., dissents in part and concurs in part and assigns reasons.
WEIMER, J., dissents and assigns reasons.
KNOLL, J., concurring in part and dissenting in part.
I concur only with the portion of the majority opinion affirming judgment in favor of the Marin plaintiffs on their contract claims. The remainder of the majority opinion contains serious and fundamental errors which have the potential to do great damage to the jurisprudence of this state. Accordingly, I respectfully dissent.
First, the majority misapplies the continuing tort doctrine, which prevents a tort claim from prescribing as long as the operating cause of injury continues. It is undisputed that, to this day, additional oilfield waste continues to seep from defendants' unlined pits into plaintiffs' property. As additional waste products enter the land, plaintiffs suffer additional and increasing damages. Incredibly, the majority holds prescription began to run from the moment the pits were closed. This exceedingly narrow interpretation of the continuing tort doctrine means that, no matter how much additional waste continues to seep onto the property in the future, plaintiffs will be left without a remedy.
Second, the majority errs in its discussion of contra non valentem. We have long held contra non valentem tolls prescription where the "debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action." Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598, 604 (1916). The trial court found that, beginning in 1991, Exxon provided plaintiffs with documents purporting to show the remediation was complete and the pits were cleaned in accordance with state regulations. These representations were objectively false and misleading. The trial court made a factual determination and found the plaintiffs believed Exxon and "detrimentally relied on these disclosures." The majority admits that Exxon's blatant factual misrepresentation were "less than acceptable," yet inexplicably concludes these lies are insufficient to trigger contra non valentem. We should affirm the trial court, as the record demonstrates Exxon purposefully misled plaintiffs into believing their land was properly remediated, lulling them into a false sense of security and fraudulently discouraging them from timely filing suit. This is a textbook case of contra non valentem. The majority effectively encourages polluters to commit fraud in order to prevent plaintiffs from bringing meritorious suits.
Moreover, the majority breaches the manifest error doctrine and fails to give due deference to the trial court's finding of fact that plaintiffs had no actual or constructive knowledge of the contamination. After conducting two separate site visits and hearing testimony from witnesses for both sides, the trial court found plaintiffs were unable to determine the property was contaminated until they obtained an expert report. Given the underground nature of the contamination and the fraud on the part of Exxon, there was nothing unreasonable about the court's factual findings, and the majority errs in overturning it absent manifest error.

A. The Majority Misapplies The Continuing Tort Doctrine

The majority opinion undermines the continuing tort doctrine, which tolls prescription *264 on tort claims as long as the offending action continues to cause successive damages to plaintiff. When "the damages claimed are predicated on alleged continuous wrongful acts, causes which are supposed to occur daily, and to produce effects daily repeated . . . `prescription, whatever the length of time, has no application.'" Di Carlo v. Laundry & Dry Cleaning Service, 178 La. 676, 152 So. 327, 329 (1933)(quoting Northwestern Fertilizing Co. v. Hyde Park, 97 U.S. 659, 668-69, 24 L.Ed. 1036 (1878)). A continuing tort exists whenever the "operating cause of injury is a continuous one and gives rise to successive damages." Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726.
The continuing tort doctrine has been applied by Louisiana courts for nearly eighty years. We most recently considered the doctrine in Hogg v. Chevron, 2009-2632 (La.7/6/2010), 45 So.3d 991. In Hogg, plaintiff landowners sued a service station owner whose underground tanks had leaked, spilling chemicals which contaminated plaintiffs' land. Id. at 994. Although the leaking tanks were replaced in 1997, the chemicals were not remediated and continued migrating from defendant's land towards plaintiffs' land and into their stream. Despite the continuously increasing nature of this contamination, this Court nonetheless found the operating cause of injury was the leaking tanks, not the contamination itself. Prescription therefore began to run the day the tanks were replaced. Id.
In my view, Hogg was wrongfully decided. See Id. at 1007 (Knoll, J., dissenting). The majority artificially limited the continuing tort doctrine even where the injury-causing activity (i.e., the contamination) remained under plaintiffs' land, causing additional damages. As long as harmful chemicals remain under plaintiffs' land, the trespass continues, and prescription cannot begin while the wrongful conduct is still ongoing. Id. at 1003. This rationale applies equally in the case currently before us, and I dissent for the same reasons set forth in Hogg.
Arguendo, even if Hogg were a correct statement of law, the majority opinion misapplies Hogg and expands its holding well beyond its facts. The primary question in any continuing tort case is whether "the operating cause of injury is a continuous one." Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726. In Hogg, after the leaking gas tanks were removed, no additional chemicals entered the land.[1] The Court defined the "operating cause of injury" as the leak itself, which ceased when the tanks were removed. Here, unlike the "leaking tanks" in Hogg, the unlined waste pits remain on plaintiffs' property and continue to leach additional noxious chemicals into the soil. As each additional ounce of waste migrates under plaintiffs' land, the level of contamination increases, and plaintiffs' successive damages increase.
Here, through faulty analysis, and despite overwhelming evidence to the contrary, the majority somehow concludes that the continued leakage from the pits does not constitute a continuing tort. Instead, it holds the "operating cause of injury" was "the actual disposal or storage of the oilfield waste in unlined pits on plaintiffs' property." This is untenable. There is nothing inherently injurious about a mineral lease operator disposing of oilfield wastes pursuant to the parties' lease. Put *265 otherwise, plaintiffs have no actionable claim based on the mere digging of the pit or the placing of waste in that pit. The claim arises only when contaminants begin to seep out of that pit and into the plaintiffs' soil.
A simple hypothetical will demonstrate the flaw in the majority's position. Assume the pits dug by Exxon in the 1940s were properly lined, and the contaminants were safely stored. However, over the years the lining began to deteriorate. In 1991, for the first time, contaminants began to escape from the pits and enter plaintiffs' land. If, as the majority holds, the wrongful "conduct terminated when the pits were closed," plaintiffs' claim would have prescribed when the pit was closed in the 1940s, many years before any contaminants entered the property. Plaintiffs would be precluded from seeking any relief for any contamination, no matter how serious, resulting from the oilfield operations. The majority's position is inequitable, contrary to established law, and creates bad policy.

B. Contra Non Valentem

The majority opinion also errs in its consideration of the contra non valentem doctrine. Contra non valentem is an "equitable doctrine of Roman origin, with roots in both civil and common law," designed to avoid the harshness of applying prescription where the plaintiff has been prevented from timely filing suit. Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261, 1268. Without citation to any authority, the majority claims contra non valentem requires "extraordinary circumstances." We have never held the application of contra non valentem requires "extraordinary circumstances," and it is regularly applied by Louisiana courts.
There are four circumstances where contra non valentem applies:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action;
(2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
(4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant.
Id.
The trial court found the last two categories were met. Exxon purposefully misled plaintiffs into believing their land had been properly remediated, thereby preventing plaintiffs from timely availing themselves of the cause of action. The court also held that determining whether the property was contaminated requires scientific analysis beyond the abilities of a normal person, so an "average person would have no knowledge of whether a pit was properly cleaned or not." As detailed below, these findings by the trial court are well-supported by the record and should not be disturbed.

1. Exxon's Misrepresentations

First, there is ample evidence in the record to support the trial court's finding that Exxon misled plaintiffs into believing the waste pits had been cleaned in conformance with regulatory standards. Prior to 1991, Claude Breaux, acting on behalf of both the Marin plaintiffs and the Breaux plaintiffs, repeatedly asked Exxon to close the pits and conduct necessary remediation. Exxon's attempted remediation ceased in 1991.
*266 The majority concedes Exxon conducted two additional environmental assessments after the 1991 remediationone in 1993, one in 2001and both of these assessments revealed contamination exceeding regulatory limits. Since at least 1986, Exxon was aware that the produced water on the property included radioactive material, including measurable amounts of radium 226 and 228, yet did not report this to the DEQ as required by state regulations. In short, Exxon knew the property was significantly more contaminated than either plaintiffs or the state believed, yet purposefully covered up this contamination.[2]
It is well settled that contra non valentem applies in cases involving "acts of fraud and misrepresentation intentionally committed by defendants (or their representative) designed to hinder, impede or prevent plaintiffs from asserting their cause of action or lull them into a false sense of security." Plaquemines Parish Commission Council v. Delta Development Co., Inc., 502 So.2d 1034, 1056-57 (La.1987); Nathan v. Carter, 372 So.2d 560, 563 (La.1979).
This species of contra non valentem is simply a specific example of the general legal principle that a party cannot "take advantage of his own wrongful act." Nathan, 372 So.2d at 562. Yet that is precisely what the majority opinion allows Exxon to do. Over a period of several years, Exxon repeatedly told plaintiffs the property was cleaned up within regulatory standards. In 1991, Exxon sent a letter stating "You will find that all parameters including salt are well below accepted standards and state regulations." Plaintiffs, perhaps naively, trusted Exxon's representations and chose not to sue. Exxon, a highly sophisticated party, was in a far better position than the plaintiffs to assess the level of contamination, and knew that plaintiffs relied on it to perform the relevant testing and remediation. Exxon used its superior position to mislead plaintiffs and prevent them from timely filing suit. This is precisely the kind of fraudulent activity which triggers the application of contra non valentem.
Exxon also misled the plaintiffs by repeatedly telling them it would fix any issues on the property, then failing to do so. As Claude Breaux testified, Exxon employees "said we will address [the remediation issues] and get back to you. That stopped untileven when suit was filed, I was reluctant to file suit because Exxon had convinced me they were still coming back. I still thought Exxon was coming back to fix my pit sites" (Emphasis added). This is the very definition of "lulling" a plaintiff into a false sense of security to prevent him from filing suit.
The majority's holding would be bad enough if this Court were acting as the finder of fact with discretion to make judgment calls and weigh the evidence. We are not. Instead, we are required to give great deference to the trial court's factual findings, and may upset its ruling only upon a finding of manifest error. Stobart v. State Dept. of Transportation and Development, 617 So.2d 880, 882 (La.1993). Incredibly, the majority opinion simply skims past the manifest error doctrine, which is a fundamental precept of appellate review.[3] There is nothing in the record *267 suggesting that the trial court's finding of fraud and misrepresentation by Exxon was objectively unreasonable or that the trial court manifestly erred.
The majority opinion admits "Exxon misled plaintiffs by not disclosing the extent of the contamination," but excuses this fraud by noting Exxon "did nothing to prevent plaintiffs from investigating the cause of the sugarcane loss for themselves." In essence, the majority does not castigate Exxon for lying, but finds fault with plaintiffs for believing the lies. Permitting Exxon to profit from its own misrepresentations is both extraordinarily inequitable and contrary to established law.[4]

2. Plaintiffs' Constructive Knowledge of the Contamination

Contra non valentem also applies where the "cause of action is not known or reasonably knowable by the plaintiff." Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261, 1268. This particularly applies where specific scientific or technical knowledge is necessary to discover the injury. For instance, where a plaintiff suffers injury as a result of asbestos exposure, but was not diagnosed for several years, prescription does not begin to run until diagnosis. Owens v. Martin, 449 So.2d 448, 451 n. 4 (La.1984).
Here, the underground contamination of plaintiffs' property is not immediately noticeable. As evidenced by the mountain of specialized expert testimony introduced at trial, it takes a significant amount of training to determine the nature and scope of such contamination. The majority cites South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 532 (La.1982), which holds "the prescriptive period for damage to adjacent land commences when the damage becomes apparent and the injured party discovers who or what caused it." However, there is no evidence that the contamination beneath plaintiffs' land was "apparent." The noxious substances highly concentrated saltwater, heavy metals, and radioactive material[5] are invisible and underground. As the trial court explained:
The Court further finds that the average person would have no knowledge of whether a pit was properly cleaned or not. After trying this case for some three years and having viewed the property on two separate occasions with the attorneys, the Court cannot see with the naked eye that anything is wrong with the surface of the land. However, after hearing the testimony, the Court believes that there are some problems with the land where oilfield pits existed, pipe cleaning existed, and where oilfield surface operations were conducted. The Court finds, as did the trial court and Court of Appeal in Hazelwood, supra,[6] that the doctrine of contra non valentum [sic] applies to this case and prescription does not begin to run until the *268 plaintiffs had full knowledge of the extent of damage as reported by the initial report of Greg Miller, plaintiffs' expert.
The manifest error doctrine is particularly applicable in this situation. The trial court presided over the case for three years, listened to several days of witness and expert testimony, viewed dozens of exhibits, and had firsthand knowledge of the condition of the property from two site visits. This Court, viewing a cold record, is simply not in a position to second guess the trial court's considered factual findings and conclude plaintiffs "should have known" the property was contaminated based solely on the fact that some, but not all, of the sugarcane planted on the property had stunted growth. The majority implies plaintiff Claude Breaux's prior employment for Exxon gives him insight into soil contamination and remediation. However, Breaux worked in fuel delivery, and there is no evidence that he or any of the other plaintiffs had the specialized scientific knowledge necessary to determine whether the land was contaminated. Indeed, Breaux testified with respect to the pits "I did not know it was hazardous. I have no reason to know." Later, he testified "Did I know those pits had hazardous chemicals? No sir, I did not. I thought it might have been water." The trial court judged his testimony credible, and we must defer to the court's credibility determination.
The majority's citation to Hogg v. Chevron, 2009-2632 (La.7/6/2010), 45 So.3d 991, is again inapposite. In Hogg, plaintiffs received two official written notices from the Louisiana Department of Environmental Quality stating their stream was contaminated by gasoline which had leaked from defendant's tanks. This is sufficient to put any reasonable plaintiff on direct notice of contamination. Neither the Marins nor the Breauxs ever received any such direct notice, and plaintiffs had no proof of the contamination until they took it upon themselves to hire an expert to perform tests in 2003. The majority faults the plaintiffs for not hiring an expert sooner. However, plaintiffs relied on Exxon's representations that the contamination had been adequately cleaned up. Plaintiffs had no reason to suspect Exxon was lying to them, and thus no reason to hire their own expert.

Conclusion
In my view, the majority opinion misapplies the law and fails to give proper deference to the trial court's findings of fact. The majority opinion is a classical example of a court substituting its opinion for that of the finder of fact. This is a violation of the manifest error doctrine we frequently cite in reversing appellate opinions which overrule a trial court's factual findings.
This case overwhelming supports a reasonable basis for the finder of fact's conclusion. This is not our function. We function as a reviewing court, not a court of first impression, which is the pivotal impetus of the manifest error doctrine. The majority's opinion reversing the trial court's factual findings is an aberration of the manifest error doctrine; thus I cannot agree.
WEIMER, J., dissenting.
While I agree that the Marin plaintiffs are entitled to judgment in their favor, I respectfully dissent from that portion of the opinion which holds that the plaintiffs' tort claims have prescribed.
The prescriptive period applicable to the plaintiffs' tort claims is the one-year liberative prescription of LSA-C.C. art. 3493. Pursuant to this codal provision, the one-year period "commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." LSA-C.C. art. 3493. In other *269 words, the commencement of prescription under this article is triggered by actual or constructive knowledge of damage.[1]
After trying this case for three years, hearing the testimony, and viewing the property on two separate occasions, the district court concluded the plaintiffs did not have knowledge of damage, actual or constructive, sufficient to commence the running of prescription until they were apprised of the extensive contamination on the property. The district court's conclusion was based on a number of factual considerations. In particular, the district court was persuaded by the fact that while the plaintiffs did have knowledge of some problems associated with the pits, they also received assurances from Exxon that the pits had been cleaned to standards determined to be acceptable by state regulations. Noting that the average person would not possess the knowledge sufficient to counter or even question such an assurance from Exxon, the court ultimately concluded that the plaintiffs' forbearance was reasonable under the circumstances, and that prescription did not commence until an expert report revealed the truth regarding the sub-surface contamination.
As the majority opinion concedes, the ultimate issue to be resolved in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is "the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." (Emphasis added.) Slip op. at p. 246, citing Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502, and Griffin v. Kinberger, 507 So.2d 821 (La.1987). This determination of reasonableness is a factual one, subject to review for manifest error. Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354-355 (La.1992); see also Braud v. Cenac, 03-1696 (La.App. 3 Cir. 7/14/04), 879 So.2d 896, writ denied, 04-2101 (La.11/15/04), 887 So.2d 484.
In the present case, the district court weighed each of the relevant factors plaintiffs' education and intelligence, as well as the nature of defendant's conduct and concluded that the plaintiffs did not have knowledge, actual or constructive, sufficient to commence the running of prescription until they received the expert report. Without finding manifest error in the district court's factual determinations, the majority opinion rejects this conclusion, citing to the recent decision in Hogg v. Chevron USA, Inc., 09-2632 c/w 09-2635 (La.7/6/10), 45 So.3d 991, as support for its independent determination that the plaintiffs had constructive knowledge of the contamination of their property more than one year prior to the institution of this lawsuit.
However, Hogg is readily distinguishable from the instant case. As the majority opinion concedes, the information in the hands of the Hogg plaintiffs "is far more detailed than the information the Marins and Breauxs had." Slip op. at 249. Not *270 only did the Hogg plaintiffs have more information, such as test results showing the location of test samplings taken from plaintiffs' property as well as the types and levels of contaminants detected, but that information came from an independent third party, the Louisiana Department of Environmental Quality, which has expertise in this area.
The situation in this case is much different. Here, the plaintiffs were told by the defendant, Exxon, that remediation was complete. Whether Exxon intentionally misrepresented this fact or simply did not know better, despite its battery of experts, the fact remains that conduct by Exxon in the form of affirmative assertions that the property had been cleaned up in accordance with all applicable regulatory standards led the plaintiffs to believe that any problems were cured. The district court determined that the plaintiffs were reasonable in relying upon these representations from Exxon. The fact that problems persisted in the surface area surrounding the pits did not undermine the reasonableness of the plaintiffs' reliance, as plaintiffs were obligated to tolerate some degree of ordinary, customary, and necessary wear and tear on the property attributable to Exxon's operations. See, Rohner v. Austral Oil Exploration Company, 104 So.2d 253, 256 (La.App. 1 Cir.1958) (Infertility of three acres of land used for pits, and clay and drilling operations was due to ordinary, customary, and necessary acts of drilling company; landowner could not recover for crop loss.).
The majority opinion fully documents the actions of Exxon which convinced the district court that Exxon's conduct prevented the plaintiffs from acquiring the requisite knowledge to commence the running of prescription more than one year prior to the date suit was filed, and those actions will not be repeated here. Suffice it to say that insofar as discovery of the contamination is concerned, either Exxon misrepresented the true facts or Exxon believed it had remedied the problem, and now, along with the majority opinion, would hold plaintiffs to a higher standard than Exxon holds itself. In effect, the argument in this case, and the one adopted by the majority, is to the effect that, "We (Exxon) told plaintiffs we had remediated the contamination; they were unreasonable to believe anything we said."
The district court rejected this argument, and there is ample evidence in the record to support the conclusion that prescription did not begin to run until plaintiffs received the report of their expert. In other words, given Exxon's representations, it was reasonable for the plaintiffs to delay filing suit until they received the report of an independent expert as to the actual state of the contamination. As the court of appeal correctly recognized, the record fully supports the district court's conclusion that the plaintiffs, along with many of the Exxon personnel involved, lacked sufficient knowledge of the nature or extent of the damage or contamination to commence the running of prescription on that basis. This factual determination of the district court is not manifestly erroneous, and should not have been disturbed.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
[1] "Legacy litigation" refers to hundreds of cases filed by landowners seeking damages from oil and gas exploration companies for alleged environmental damage in the wake of this Court's decision in Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686. These types of actions are known as "legacy litigation" because they often arise from operations conducted many decades ago, leaving an unwanted "legacy" in the form of actual or alleged contamination. Loulan Pitre, Jr., "Legacy Litigation" and Act 312 of 2006, 20 Tul. Envt. L.J. 347, 34 (Summer 2007).
[2] As will be explained in full in the Facts and Procedural History section of this Opinion, there are two sets of plaintiffs in this case, the "Marin plaintiffs" and the "Breaux plaintiffs."
[3] Exxon's predecessors are W.S. Mackey and Humble Oil and Refining Company ("Humble"). Within this opinion, references to actions taken by Exxon may refer to actions taken by one of its predecessors.
[4] The primary area of contamination on the Marin's property was referred to at trial as the "big pit," the "Marin pit," or "Marin Pit No. 1." Though Exxon built and used this pit under the authority of the Marin Mineral Lease, the parcel on which the pit was located is also covered by the Surface Lease as novated and amended in 2001.
[5] "Produced water" is a term used to describe the waste byproduct of the extraction of oil and gas from wells.
[6] See infra, page 248.
[7] In Corbello, this Court held that unlike damages in a tort claim, damages in a breach of contract claim need not be "tethered" to the value of the property. 850 So.2d at 693. Further, the Court recognized that under the then-existing statutory framework, a landowner who collected such damages could not be required to actually use the damages to remediate the property. Id. at 699. The Corbello court stressed the failure of the legislature to create such a requirement. Id. at 699-701. In response, the legislature enacted the "Corbello Act" of 2003, creating La. R.S. 30:2015.1, which required plaintiffs alleging contamination claims relating to usable ground water to notify the DEQ of such claims, and if a claim under 2015.1 was established, required the responsible party to formulate a remediation plan and deposit funds in the registry of the court to fund the actual implementation of the remediation plan under court supervision. La. R.S. 30:2015.1(C). In 2006, the Legislature passed Act 312, which was designed to protect the public interest in litigation claiming environmental damage arising from oilfield operations. Thus, court-supervised, defendant-funded cleanup is required for all environmental damage claims resulting from oilfield operations, not just ground water claims. However, Act 312 specifically provides that it shall not be construed to impede or limit provisions in private contracts imposing remediation obligations in excess of regulatory requirements. La. R.S. 30:29(H).
[8] This was apparently in response to Exxon's argument that any claims arising out of the surface use agreements were premature and that the novation superseded the terms of the Surface Lease and provided no grounds for termination upon violation of environmental standards. The trial court found that "Exxon cannot enter into a novation to defeat the claim of the Marins for the cancellation of the terminal lease."
[9] Specifically, the appellate court found:

[w]e find the record is replete with testimony concerning promises and assurances made by Exxon personnel to remedy the problem with the sugarcane and to "fix" the pit situation, which lulled the plaintiffs into inaction. For example, Breaux testified that Mike Hluza stated, "You know Exxon only has one release and we can't release our environmental responsibility. This [(a release Breaux signed)] is to give you your land back to see if it will grow cane a second time." Breaux further testified, "I had to believe Exxon didn't lie, and if they told me it was in full compliance, I had to believe them . . . [Y]ou'all assured me it doesn't matter, if it doesn't grow cane, we're coming back and fix it anyway."
Mike Hluza testified that the remediation goal was to return the property to farmable condition stating, "[t]hat was the expectation." Yet, after performing its second attempt to close the last Breaux pit, Exxon sent Breaux only the data relating to one sample taken of the top 6-8 feet of soil. As the record clearly reflects, at a minimum, Exxon undisputedly omitted critical date from several other samples from different areas of property, taken within ten days of the sample for which Breaux was given results, showing those samples were not in compliance with Order 29-B. Moreover, soil had been hauled in and mixed with "clean material" from the pits, and it is unclear whether the soil that was tested was actually the soil that was in the pit or was the new soil hauled in.
Moreover, although the trial court did not specifically rely on the "lulling" component of contra non valentem in overruling Exxon's exception of prescription, the court did expressly and properly find that plaintiffs detrimentally relied on documents supplied to them by Exxon representing that the remediation was complete and that the pits were cleaned to applicable standards and "parameters, including salts." When a plaintiff has been lulled into inaction by a defendant's misrepresentations, prescription is suspended until plaintiff is made aware of the truth of the matter. Miley v. Consolidated Gravity Drainage District No. 1, 1993-1321 (La.App. 1st Cir.9/12/94), 642 So.2d 693, 698. Thus, given the facts presented, we also find that Exxon's assurances were sufficient to constitute a "lulling" as contemplated under the contra non valentem jurisprudence.
Slip Op. at 12-13, 2009 WL 7004332.
[10] Not relevant to these writ applications, the court of appeal reversed a finding of the trial court that an Exxon employee, Michael Bourgeois, was liable in solido with Exxon for plaintiffs' damages.
[11] In Corsey v. State, Through Department of Corrections, 375 So.2d 1319 (La. 1979), this Court described the fourth category of contra non valentem as "generically similar to instances provided by statute where prescription does not begin to run until the claimant has knowledge of his cause of action." 375 So.2d at 1322. "In these, the cause of action does not mature (so prescription does not begin to run) until it is known or at least knowable." Id.
[12] In discussing the discovery rule in relation to a medical malpractice claim, this Court defined the date of discovery for purposes of tolling the prescriptive period as follows:

Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription.
Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502, 510-11 (cites omitted).
[13] Both lower courts found that this release did not constitute a compromise of plaintiffs' present claims and this finding was not assigned as error to this Court.
[14] As stated in Eastin v. Entergy Corp., 03-1030 (La.2/6/04), 865 So.2d 49, 55, n. 4, in applying the discovery rule in non-medical malpractice cases, there is a distinction from how that rule is applied in medical malpractice cases:

We distinguish the instant case from those in which the doctrine has traditionally applied: those cases involving medical malpractice actions (In Re: Medical Review Panel of Howard, 573 So.2d 472 (La.1991); Branch v. Willis-Knighton Medical Center, 92-3086 (La.4/28/94), 636 So.2d 211 (Prescriptive period did not commence until plaintiffs discovered the damage, the delict and their relationship, when disease was diagnosed)); long-latency diseases (Brown v. R.J. Reynolds Tobacco Co., 52 F.3d 524 (5th Cir.1995) (Plaintiff cannot learn of damages suffered until many years after exposure); Cole v. Celotex, 620 So.2d 1154 (La. 1993) (Damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support the accrual of the cause of action); Watkins v. J. Ray McDermott, Inc., 466 So.2d 636 (La. App. 5 Cir.1985), Richardson, Jr. v. Avondale Shipyards, Inc., 600 So.2d 801 (La. App. 5 Cir.1992) (Where a progressive occupational disease is involved, prescription begins to run when the disease has manifested itself and the victim is aware of it)); or torts involving juveniles (Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206 (Doctrine of contra non valentem suspended running of prescription until parents of molested child learned about molestation)). None of these circumstances exist in this case [employment discrimination] and are easily distinguishable because the plaintiffs in those cases were prevented from knowing of their damages until some time after the action or inaction of the defendant, i.e., the damages manifested at a later date.
[15] In a case with substantially similar facts, the United States Fifth Circuit Court of Appeals recently held that plaintiffs' claims for contamination of their property caused by oil and gas operations by Chevron were prescribed. Kling Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510 (5th Cir.(La.) 7/10/09). Like this case, plaintiffs knew that Chevron was dumping salt water, oily by products and chemicals on their land in their oil and gas operations, knew sugarcane would not grow, and entered into a release and settlement with Chevron. This all occurred over 30 years before they brought their claim for property damage. The court held that the doctrine of contra non valentem did not apply because knowledge of these facts was "sufficient to excite attention and prompt further inquiry" into the damage to their property. Id. at 518.

A major difference in the Kling case, at least as to the Marin Plaintiffs, is that the lease in Kling had also expired 30 years before the plaintiffs brought their suit. As will be discussed later, the Marin Lease and Surface Lease were still in effect at the time suit was filed.
Another difference between this case and the Kling case is that in Kling, while the plaintiffs alleged that Chevron misled them about the kind and extent of contamination, the court found no evidence in the record that Chevron knew of any increased contamination or otherwise after the parties entered into the release and settlement. In this case, the trial court found that Exxon misled the plaintiffs about the extent of contamination on their land by providing incomplete reports showing that the land met the applicable standards. This issue is relevant to whether the plaintiffs were lulled into inaction under the third category of contra non valentem.
[16] The Official Revision Comments state that these articles did not change the substantive law in effect prior to the 2005 revisions to the Civil Code lease articles. Corresponding former articles were La. C.C. arts. 2719 and 2720. Former La. C.C. art. 2719 provided:

If an inventory has been made of the premises in which the situation, at the time of the lease, has been stated, it shall be the duty of the lessee to deliver back everything in the same state in which it was when taken possession of by him, making, however, the necessary allowance for wear and tear and for unavoidable accidents.
Former Article 2720 provided:
If no inventory has been made, the lessee is presumed to have received the thing in good order, and he must return it in the same state, with the exceptions contained in the preceding article.
[17] Prior to 2004, parts of this provision were essentially contained in La. C.C. 2710, which provided:

Obligations of the lessee arising from nature of contract
The lessee is bound:
1. To enjoy the thing leased as a good administrator, according to the use for which it was intended.
2. To pay the rent at the terms agreed on.
[18] We note that one of the reasons we granted this writ was to determine whether a subsequent purchaser has the right to sue for property damages that occurred before he purchased the property, particularly where the damage was not overt. However, we need not reach that determination in this case because, assuming the Breauxs had a right as a subsequent purchaser to sue in tort for property damage, that right has prescribed. Further, we note that regardless of who has standing to pursue claims for money damages, the current owner of property always has the right to seek a regulatory cleanup of a contaminated site. La. R.S. 30:6(F); La. R.S. 30:16.
[19] Likewise, in Broussard v. Hilcorp Energy Co., 09-0449 (La. 10/20/09), 24 So.3d 813, this Court considered whether claims for remediation/restoration were covered under La. R.S. 30:136, which required that the landowner to give notice to the mineral lessee before he could file suit for certain types of damages. Specifically, La. R.S. 30:136 provides in part:

If a mineral lessor seeks relief from his lessee arising from drainage of the property leased or from any other claim that the lessee has failed to develop and operate the property leased as a prudent operator, he must give his lessee written notice of the asserted breach to perform and allow a reasonable time for performance by the lessee as a prerequisite to a judicial demand for damages or dissolution of the lease.
Relying on Castex, a majority of this Court held that claims for remediation and restoration were not encompassed in the duty to "develop and operate the property leased as a prudent operator," under La. R.S. 30:122, therefore, no pre-suit notice was necessary.
[20] As stated earlier, this finding was not assigned as error to this Court.
[21] Castex stated that La. R.S. 31:122 did not contain an express duty to restore, "it simply adapts the general `good administrator' standard of [former] La. Civ.Code art. 2710, applicable to all leases, to the specific context of a mineral lease." 893 So.2d at 797. Castex explained that former Articles 2719 and 2720 provide further support for limiting the lessee's duty to restore to circumstances where a lessee has operated excessively. 893 So.2d at 800-801. "Articles 2719 and 2720 do not impose a strict obligation to restore leased property in an unchanged condition." Id. at 801. "Rather, both articles allow for deterioration of the leased property because of necessary `wear and tear.'" Id.
[22] In Castex, the Court found there was no evidence that the lessee's operation was unreasonable or excessive where they complied with all relevant state regulations and their decision not to backfill the canals was consistent with industry custom. Likewise, Exxon argues that it was never cited for violating any environmental regulations and that dumping into unlined pits was consistent with industry custom.
[23] While plaintiffs argue that 29B standards still do not allow them to grow sugarcane, all parties recognize that the claims for sugarcane damage have already been settled by virtue of the 1991 release and 1994 novation. And, as recognized by plaintiffs' counsel at oral argument, if this was a claim for sugarcane damage, it would have prescribed. Further, there is no problem growing sugarcane on the vast majority of the Marin and Breaux properties.
[24] We note that in their pleadings, plaintiffs specifically stated:

Further, plaintiffs herein do not make any judicial demand or claim for the recovery of damages for the evaluation and remediation of any contamination or pollution that impacts or threatens to impact "usable ground water," as such term is defined in La. R.S. 30:2015.1 J(1), as amended by Louisiana Act No. 1166 of 2003. The provisions of La. R.S. 30:2015.1 do not apply to this action.
Nonetheless, they now argue Exxon is responsible for groundwater clean up under that statute.
[25] We note again that plaintiffs' petition makes no claim for groundwater remediation and in fact specifically states that they are not making any claims for groundwater remedition. The petition was never amended to make such a claim.
[1] However, chemicals present under defendant's land did continue to migrate under plaintiffs' land.
[2] Nor was this the first time Exxon misrepresented the true amount of environmental damage its operations were causing. As far back as 1966, Exxon's predecessor company Humble discovered the amount of saltwater created by the operations was over two thousand times higher than the amount it reported to the state. Yet Humble, in order to avoid additional cleanup costs, chose to keep silent.
[3] Significantly, the majority does rely on the manifest error doctrine later in the opinion in affirming the dismissal of plaintiffs' claim for groundwater contamination.
[4] The majority's citation to Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, 731, is singularly inapposite. In Crump, there was "no evidence or allegation of concealment or fraudulent conduct on the part of the defendant." (Emphasis added). Here, Exxon's fraud is well-established.
[5] The heavy metals discovered under plaintiffs' land include cadmium, lead, and arsenic, which plaintiffs' expert described as "greatly exceeding" the relevant standards. The soil samples also contained barium, radium-226, and radium-228, which are radioactive heavy metals.
[6] Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp., 2002-266 (La.App. 3 Cir. 4/2/03), 844 So.2d 380, writ denied, 2003-1585 (La. 10/31/03) 857 So.2d 476.
[1] Although the majority opinion couches its discussion of the plaintiffs' actual or constructive knowledge in terms of the fourth category of the equitable doctrine of contra non valentem, resort to that doctrine is neither necessary nor appropriate in this case, as the codal article controls. While there is no significant difference between the definition of the notice requirement in either context, there is a difference in the rules of construction that apply. For example, as the majority points out, "the doctrine of contra non valentem only applies in `exceptional circumstances.'" Slip op. at p. 245, quoting Renfroe v. State, Dept. of Transportation and Development, 01-1646, p. 9 (La.2/26/02), 809 So.2d 947, 953. Prescriptive statutes such as LSA-C.C. art. 3493, on the other hand, are to be strictly construed against prescription and in favor of the obligation sought to be extinguished. Lima v. Schmidt, 595 So.2d 624, 629 (La.1992).