# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 16-267


STEVEN TRAHAN, ET AL.

VERSUS

BP AMERICA PRODUCTION COMPANY, ET AL.



**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-18837
HONORABLE PENELOPE Q. RICHARD, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**PHYLLIS M. KEATY**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Phyllis M. Keaty, Judges.



**REVERSED AND REMANDED.**

**Victor L. Marcello**
**Donald T. Carmouche**
**John H. Carmouche**
**William R. Coenen, III**
**Brian T. Carmouche**
**Todd J. Wimberley**
**Ross Donnes**
**D. Adele Owen**
**Leah C. Poole**
**Caroline H. Martin**
**Talbot, Carmouche & Marzullo**
**17405 Perkins Road**
**Baton Rouge, Louisiana  70810**
**(225) 400-9991**
**Counsel for Plaintiffs/Appellants:**
      **Steven Trahan, et al.**

**Chad E. Mudd**
**David P. Brucchaus**
**M. Keith Prudhomme**
**Matthew P. Keating**
**Mudd & Bruchhaus, LLC**
**410 East College Street**
**Lake Charles, Louisiana  70605**
**(337) 562-2327**
**Counsel for Plaintiffs/Appellants:**
      **Steven Trahan, et al.**

**Lawrence G. Gettys**
**Heard Robins Cloud LLP**
**9191 Siegen Lane, Building 7**
**Baton Rouge, Louisiana  70810**
**(866) 517-9520**
**Counsel for Plaintiffs/Appellants:**
      **Steven Trahan, et al.**

**Stephen Taggart**
**Stephen Taggart & Associates**
**3532 Highway 365**
**Nederland, Texas 77627**
**(409) 722-3375**
**Counsel for Plaintiffs/Appellants:**
      **Steven Trahan, et al.**

**George Arceneaux, III**
**Lawrence P. Simon, Jr.**
**Penny L. Malbrew**
**George H. Robinson, Jr.**
**William E. Kellner**
**Brittan Bush**
**Liskow & Lewis**
**Post Office Box 52008**
**Lafayette, Louisiana  70505**
**(337) 232-7424**
**Counsel for Defendant/Appellee:**
     **BP America Production Company**

**Katherine Seegers Roth**
**Kathryn Z Gonski**
**Kelly B. Becker**
**Liskow & Lewis**
**701 Poydras Street, Suite 5000**
**New Orleans, Louisiana  70139-5099**
**(504) 581-7979**
**Counsel for Defendant/Appellee:**
     **BP America Production Company**

**KEATY, Judge.**

Plaintiffs/landowners in this legacy litigation[1] appeal a judgment granting a motion for summary judgment based on prescription filed by defendant, BP America Production Company (BP), and dismissing their claims against it. Finding that numerous genuine issues of material fact remain, we reverse.

## FACTS AND PROCEDURAL HISTORY

According to a Petition for Damages filed on March 3, 2011, Plaintiffs own property in Cameron Parish, Louisiana, (hereinafter referred to as "the property"), which had sustained both surface and sub-surface contamination as a result of the historical oil and gas exploration and production activities of four named defendants, including BP, or their predecessors in interest. Plaintiffs sought remediation and other damages based on causes of action sounding in tort and in breach of contract and/or the Mineral Code.

Several months before a jury trial that was scheduled to take place in the fall of 2015, BP filed a motion for summary judgment seeking to have Plaintiffs' claims against it dismissed on the basis of prescription. Plaintiffs opposed the motion, asserting that they lacked actual or constructive knowledge of their causes of action until less than a year before they filed suit. Following a hearing, the trial court issued written reasons for judgment, and later a Final Judgment, granting

---

[1] In *Marin v. Exxon Mobil Corp.*, 09-2368, 09-2371, p. 1 (La. 10/19/10), 48 So.3d 234, 238, n.1, the Louisiana Supreme Court explained:

> "Legacy litigation" refers to hundreds of cases filed by landowners seeking damages from oil and gas exploration companies for alleged environmental damage in the wake of this Court's decision in *Corbello v. Iowa Production*, 02-0826 (La.2/25/03), 850 So.2d 686. These types of actions are known as "legacy litigation" because they often arise from operations conducted many decades ago, leaving an unwanted "legacy" in the form of actual or alleged contamination. Loulan Pitre, Jr., *"Legacy Litigation" and Act 312 of 2006,* 20 Tul. Envt. L.J. 347, 34 (Summer 2007).

BP's motion for summary judgment, dismissing Plaintiffs' claims against it, and designating the judgment as final and appealable under La.Code Civ.P. art. 1915(A). Plaintiffs timely appealed.

## DISCUSSION

### _Law_

Summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admission, together with the affidavits, if any, admitted for purpose of the motion for summary judgment, show that there is no genuine issue as to any material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B)(2).[2] "A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." _Smitko v. Gulf S. Shrimp, Inc._, 11-2566, p. 7 (La. 7/2/12), 94 So.3d 750, 755.

As noted in La.Code Civ.P. art. 966(A)(2), "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. . . . The procedure is favored and shall be construed to accomplish these ends." Nevertheless:

> [t]he burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his

---

[2] Louisiana Code of Civil Procedure 966 was amended by 2015 La. Acts No. 422, § 1, effective January 1, 2016. Accordingly, we refer to the version of the article that was in place when BP's motion for summary judgment was heard on September 28, 2015.

evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2).

The Louisiana Supreme Court has held that "[s]ummary judgment is seldom appropriate for determinations based on subjective facts, such as motive, intent, good faith, knowledge and malice." *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 28 (La. 7/5/94), 639 So.2d 730, 751. In *Jagneaux v. Frohn*, 11-461, p. 6 (La.App. 3 Cir. 10/5/11), 74 So.3d 309, 313 (quoting *Johnson v. Gov't Emps. Ins. Co.*, 05-476, pp. 5-6 (La.App. 3 Cir. 11/2/05), 916 So.2d 451, 454), upon appellate review of a trial court's grant of summary judgment, this court held that "it is not the function of the trial court to determine or inquire into the merits of issues raised, and the trial court may not weigh the conflicting evidence on a material fact. If evidence presented is subject to conflicting interpretations, summary judgment is not proper."

"Although typically asserted through the procedural vehicle of the peremptory exception, the defense of prescription may also be raised by motion for summary judgment." *Hogg v. Chevron USA, Inc.*, 09-2632, 09-2635, p. 6 (La. 7/6/10), 45 So.3d 991, 997. "When prescription is raised by motion for summary judgment, review is *de novo,* using the same criteria used by the district court in determining whether summary judgment is appropriate." *Id.* In *Labbe Service Garage, Inc. v. LBM Distributors, Inc.*, 94-1043, pp. 10-11 (La.App. 3 Cir. 2/1/95), 650 So.2d 824, 829 (citation omitted), this court noted:

> [T]he filing of a motion for summary judgment based on the plea of prescription practically subjects the movers to a higher burden of proof than if the movers had filed only the peremptory exception of prescription. The burden of proof on the movers for summary judgment . . . is particularly exacting in that they are required to prove, based solely on documentary evidence and without the benefit of

testimony at a hearing, that there is no genuine material factual issue in dispute regarding the day upon which plaintiff acquired or should have acquired knowledge of the damage. On the other hand, pleading prescription alone subjects the exceptor to proving, by a preponderance of the evidence, that the plaintiff's claim has prescribed. Additionally, if on the face of the petition it appears that prescription has run, the burden shifts to the plaintiff to prove an interruption or suspension of the prescriptive period. At a hearing on the exception of prescription, the parties are allowed to call witnesses to testify and the factfinder is allowed to weigh credibility. On summary judgment, this is prohibited.

*See also*, *Hogg*, 45 So.3d 991. "Damage is sustained, within the meaning of prescription, only when it has manifested itself with sufficient certainty to support the accrual of a cause of action. *Cole v. Celotex Corporation*, 620 So.2d 1154 (La.1993). The damages suffered must at least be actual and appreciable in quality." *Labbe*, 650 So.2d at 829.

In this case, Plaintiffs' claims that derive from contracts or mineral leases fall under the ten-year liberative prescriptive period applicable to personal actions found in La.Civ.Code art. 3499. Plaintiffs' tort claims are governed by La.Civ.Code art. 3493, which provides that "when damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage."

"[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Marin*, 48 So.3d at 246. In *Hogg*, 45 So.3d at 997-98, the supreme court noted:

> Constructive knowledge has been defined by our courts as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. *Campo v. Correa*, 01-2707, p. 12 (La.6/21/02), 828 So.2d 502, 510-511. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry

4

might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. *Id.* In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, this court's ultimate consideration is the reasonableness of the injured party's action or inaction in light of the surrounding circumstances.

In *Labbe*, 650 So.2d at 829-30, we explained:

> The doctrine of *contra non valentem agere nulla currit praescriptio* prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff. Often, it is difficult to identify the precise time at which the claimant becomes aware of sufficient facts to begin the running of prescription.

The supreme court elaborated in *Marin*, 48 So.3d at 245, (footnote omitted):

> In cases involving property damage, the fourth category of *contra non valentem,* otherwise known as the "discovery rule," is encompassed in the prescriptive period proscribed by La. C.C. art. 3493, as both essentially suspend prescription until the plaintiff knew, or reasonably should have known of the damage. While the *contra non valentem* "discovery rule" is only to be applied in extreme circumstances, and prescriptive statutes are to be interpreted broadly in favor of maintaining a party's claim, the substantive analysis is the same under both La. C.C. art. 3493 and the discovery rule of *contra non valentem.*

If the defendant establishes that the plaintiff's case has prescribed, the plaintiff who "assert[s] the benefit of *contra non valentum*" bears "the burden of proof of its requisite elements and applicability." *Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp.*, 07-2206, p. 7 (La.App. 1 Cir. 6/6/08), 992 So.2d 527, 531, *writ denied,* 08-1478 (La. 10/3/08), 992 So.2d 1018.

***Plaintiffs' Assignments of Error***

Plaintiffs assert the following assignments of error (footnote omitted):

1. The trial court committed error in dismissing the claims of the plaintiffs against BP on grounds of prescription.

2. The trial court committed error by imposing the burden of proof of prescription on the plaintiffs.

5

3. The trial court erroneously applied the procedural rules governing summary judgment.

4. The trial court committed error in its interpretation of the "discovery rule" component of *contra non valentum* and in its interpretation of the "discovery rule" as expressed in Civil Code article 3493.

5. The trial court committed error in making an equitable determination on summary judgment.

6. The trial court committed error in finding that the "plaintiffs have made no showing that they discovered any new information within one year of filing suit that triggered a new awareness on the part of the landowners."

7. The trial court committed error in finding that the plaintiffs' lack of knowledge was attributable to their own "wilfulness and neglect."

8. The trial court committed error to the extent it imputed the knowledge of one or more co-owners to the remaining co-owners of the same tract.

## ANALYSIS

### *Burden of Proof*

At the outset, we note that the general premise of BP's motion for summary judgment was that Plaintiffs' claims against it had prescribed on the face of the petition, and thus, the burden of proof shifted to Plaintiffs to prove that prescription was suspended by the application of *contra non valentum*. That premise is fundamentally flawed. Because BP chose to file a motion for summary judgment based on prescription rather than an exception of prescription, no such shifting of the burden of proof to the non-movant occurred. *See Hogg*, 45 So.3d 991; *Labbe*, 650 So.2d 824. Instead, as the mover on summary judgment, BP was "required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the

6

date upon which plaintiffs acquired actual or constructive knowledge of the damage."[3] *Hogg*, 45 So.3d at 998 (citing *Labbe*, 650 So.2d 824).

As evidenced in its reasons for judgment, the trial court in this case found that BP produced evidence that its operations on the property ceased more than "forty-five years" ago and that Plaintiffs' deposition testimony revealed that they had "not learned anything new within one year of filing suit." Thereafter, citing La.Code Civ.P. art. 966(C)(2), the trial court stated that because BP had "come forward with **some evidence** to point out to the court that there is an absence of factual support for one or more elements essential to the [P]laintiffs' claims, the [P]laintiffs must produce factual support sufficient to establish that they will be able to satisfy their evidentiary burden of proof at trial." (Emphasis added). As the aforementioned quote from *Hogg* dictates, however, BP bore the burden of proof at the trial of its motion for summary judgment based on prescription, which burden required it to prove "that there is no genuine material factual issue in dispute regarding the date upon which plaintiffs acquired actual or constructive knowledge of the damage." *Hogg*, 45 So.3d at 998. Thus, the trial court should not have applied the "point[ing] out" provision of Article 966(C)(2) upon finding that BP produced "some evidence" that Plaintiffs lacked factual support for their claims, as "**some evidence**" does not equate to proving that no genuine issues of material fact remained. The reasons for judgment further revealed that upon determining that Plaintiffs' claims were facially prescribed, the trial court shifted the burden of proof to Plaintiffs to prove the applicability of *contra non valentum* without first requiring that BP meet the "particularly exacting" burden of proving

---

[3] We note that the *Hogg* court was applying the discovery rule of La.Civ.Code art. 3493 rather than the doctrine of *contra non valentum*.

7

the date Plaintiffs knew or should have known of the damage BP caused to the property. *Labbe*, 650 So.2d at 829. In both instances, the trial court erred in shifting the burden of proof to Plaintiffs. As such, we find merit to Plaintiffs' second assignment of error.

### *BP's Motion for Summary Judgment*

BP's memorandum in support of its motion for summary judgment contained a fifty-six item Statement of Undisputed Material Facts (SUMF) upon which it based its argument that Plaintiffs' claims were prescribed. BP asserted that the presence of a "White Sandy Area" that lacked vegetation on two of the nine tracts that make up the property provided all Plaintiffs and/or their ancestors in title with actual or constructive knowledge of damage to the property that was open and obvious and which should have prompted them to investigate further to ascertain the cause and extent of the contamination upon which this suit is based. BP attached to its motion historical and current aerial photography which show a sandy area that was evident since the 1940s. Historical well files were also attached to BP's motion which showed that most of the wells operated on the property by BPs predecessors were plugged and abandoned in the 1930s, with the last well having been plugged and abandoned in 1951. BP made the following statements in its SUMF with regard to Plaintiffs' knowledge of the white sandy area, which were supported by references to four Plaintiffs' depositions (footnotes omitted):

45. Although unsure if he saw the White Sandy Area, Plaintiff Raymond Reeds testified that he saw an area that lacked vegetation while rabbit hunting when he was about fifteen or sixteen years old.

46. Plaintiff Shanna Vincent Gilbert saw the White Sandy Area on the property and testified that is[sic] has been there for "quite some time."

47. Plaintiff Ernest Lowery has seen the White Sandy Area from the nearby roadway and testified it's been there for a good while.

48. Plaintiff Craig Vincent testified that the White Sandy Area had been there all his life-- since September of 1951.[4]

49. Mr. Vincent helped his father clean up the Property in the 1960s. During the cleanup, they picked up leftover boards, pipes, sucker rods and part of a tank.

50. Mr. Vincent worked in the oil and gas industry for approximately forty years. He remember[s] that grass would die if someone spilled produced water on the ground. The White Sandy Area on the property is consistent with produced water spills he observed while working in the oil and gas industry.

BP submitted that those six so-called undisputed material facts proved that the four Plaintiffs who had seen the white sandy area had actual knowledge of damages sufficient to commence the running of prescription. While it noted in its SUMF that deposition testimony from seventeen of the twenty-six Plaintiffs revealed that most of them had rarely, if ever, been to the property, BP argued that any lack of knowledge of their potential claims against it was caused by their neglect in failing to exercise any diligence, much less reasonable diligence, to observe and ascertain the condition of the property. Thus, BP claimed that those Plaintiffs had constructive knowledge of damages sufficient to commence the running of prescription. Based upon the length of time between the cessation of "any alleged damage-causing act or omission attributable to BP" and the date upon which Plaintiffs filed their petition, BP alleged that every Plaintiff's claims against it prescribed decades before they filed this suit on March 3, 2011.

_____

[4] Because Mr. Vincent was born in 1951, the implication that he had knowledge of the sandy area that dated back to his birth is wrong.

## *Plaintiffs' Memorandum in Opposition to BP's Motion for Summary Judgment*

In opposition to BP's claim that there was no genuine issue of material fact regarding their knowledge of their cause of action, and/or the timing of any such knowledge, Plaintiffs pointed to paragraph fourteen of their original petition wherein they asserted:

> Plaintiffs did not have actual or constructive knowledge of the pollution described in this petition until less than a year prior to filing of this suit. Plaintiffs did not have knowledge of the causal connection between the defendants' fault, negligence and breach of contract and the pollution at issue until less than one year prior to the filing of this suit. Plaintiffs did not have knowledge of the causal connection between the defendants' fault, negligence and breach of contract and the pollution at issue until less than a year prior to the filing of this suit.

While Plaintiffs did not specifically contest the underlying facts which BP claimed were undisputed, they vehemently disagreed with the conclusions that BP drew from those facts, and they insisted that the following material facts remained in dispute (footnote omitted):

1. Whether plaintiff-landowners or their ancestors-in-title had any actual or constructive knowledge more than one year prior to filing this lawsuit of a potential cause of action against defendants for damage to their property as a result of oil and gas operations.

2. Whether plaintiff-landowners or their ancestors-in-title had any actual or constructive knowledge more than one year prior to filing of this lawsuit that defendants' conduct caused or contributed to damage to the subject property.

3. Whether plaintiff-landowners or their ancestors-in-title had any actual or constructive knowledge that the subject property was adversely affected in some way.

4. Whether plaintiff-landowners or their ancestors-in-title had any actual or constructive knowledge that the property damage, which is the subject of this lawsuit, if any, was caused by defendants' oil and gas exploration and production operations.

5. Whether plaintiff-landowners or their ancestors-in-title possess any actual or constructive knowledge of the damages described in the original petition until less than a year prior to filing suit.

Plaintiffs cited *Winterrowd v. Travelers Indemnity Co.*, 462 So.2d 639 (La.1985) in opposition to BP's contention that their claims were prescribed by the mere fact that their petition was filed sixty years after BP's predecessors' last operations on the property. The plaintiff in that case was injured in 1976 by a malfunctioning punch press that was manufactured in 1907. The undisputed facts established a causal connection between the plaintiff's injuries and the manufacturer's failure to warn of a danger which it knew about since the time it built the punch press. The supreme court affirmed a judgment in favor of the plaintiff after finding that the manufacturer of the press violated its duty to warn "of any danger inherent in the normal use of its product which is not within the knowledge of an ordinary user." *Id.* at 642. While they acknowledged that *Winterrowd* was not a prescription case, Plaintiffs nonetheless argued that it stands for the proposition that "[l]ong delays between the actions of a defendant and the litigation of claims based on such actions are commonplace."

In support of their denial that they had actual knowledge that BP's actions may have contaminated the property, Plaintiffs' opposition referenced excerpts from sixteen of their depositions, including the four Plaintiffs whose knowledge of the white sandy area, according to BP, should be imputed to all Plaintiffs. Although one of those Plaintiffs, Craig Vincent, acknowledged in his deposition that the white sandy area resembled areas where he had seen produced water spills during his career in the oil and gas industry, he explained that such bare areas do not necessarily indicate contamination, and he stated that he had no reason to believe the property was contaminated until he was contacted by his attorney. He

noted that cows had grazed on the property for many years without ever getting sick as a result. Mr. Vincent also stated that if an oil company had contaminated a property, he would expect the oil company and the state to address the problem. Deposition testimony from the remaining three Plaintiffs who were aware of the white sandy area indicated that they never saw signs of oil and gas operations on the property, and they never saw signs that the property may have been contaminated. In addition, both Shanna Gilbert and Raymond Reeds knew the property had been used for cattle grazing, and Ernest Lowery and Mr. Reeds knew of dirt from the property being sold. The deposition excerpts from the other twelve Plaintiffs that were submitted in opposition to BP's motion were somewhat formulaic but revealed that they were generally unaware of any oilfield equipment on the property or of any signs that the property was damaged or contaminated. Two of those Plaintiffs, knew, however, that the property had been used for cattle grazing, and two others recalled that topsoil from the property had been sold in the past. The deposition excerpts revealed that most Plaintiffs learned about the condition of the property from legal counsel or family members shortly before or after suit was filed. Affidavits from eight Plaintiffs were also attached to their opposition memorandum. While none of the affiants had been on all of the property, they each stated that the entire property was rural. Each affiant stated that none of their relatives or ancestors in title ever complained to them of any pollution or damage to the property as a result of oil and gas exploration and production activities that had taken place on the property. In addition, the affiants stated that they were never contacted by an oil company or state agency regarding the possibility of the property being contaminated as a result of any past oil and gas operations. Each of the affiants stated that they "joined this lawsuit as a result of

12

becoming aware of litigation involving nearby property and the possibility of environmental damage associated with oil and gas operations on that property after this suit was filed."[5]

With regard to BP's claim that they or their ancestors in title should be deemed to have constructive knowledge of the property's condition, Plaintiffs asserted in their opposition memorandum that their "education, intelligence and background vis-à-vis oil and gas operations, industry standards, rules and regulation, normal wear and tear, excessive use and exceedances pales in comparison to that of defendants and their predecessors-in-interest." In specific reference to BP's assertion that the white sandy area should have put them on constructive notice of any contamination, Plaintiffs submitted that their deposition and affidavit testimony reflected that none of the physical characteristics of the area gave them reason to relate the area to oil and gas operations or to know that the area was caused by toxic chemicals coming from those operations. They further asserted that they had no suspicion that BP's operations were excessive or improper. Finally, Plaintiffs claimed that they "required the evidence of oilfield damage in the same vicinity of their property to connect the dots" and prompt them to investigate further.

***Relevant Caselaw Regarding Actual and Constructive Knowledge***

Two cases rendered by the Louisiana Supreme Court in 2010 provide us with guidance in determining when a plaintiff should be deemed to have actual or constructive knowledge sufficient to commence prescription in a property damage case. In *Hogg*, 45 So.3d 991, the supreme court reversed the trial court's denial of

_____

[5] One of the affiants, plaintiff Donna Lynn Pitre Istre, stated that her mother had joined this lawsuit and that she inherited the property after her mother died in 2013.

the defendants' motion for summary judgment based on prescription in a case brought by five plaintiffs who alleged that their immovable property had been contaminated from three formerly leaking underground gasoline storage tanks at a Chevron service station operating on neighboring property. After the tanks were replaced in 1997, the plaintiffs received two letters from the Louisiana Department of Environmental Quality (LDEQ) informing them that environmental contamination had been detected near the Chevron station and that they may later be asked for permission for access to their property for testing purposes. A December 20, 2001 letter told the plaintiffs that "water samples collected from [an] unnamed stream" on their property "indicated 'the presence of chemicals commonly found in gasoline.'" *Hogg*, 45 So.3d at 995. The letter "specifically explained: 'Due to the direction of groundwater flow, there is a possibility that gasoline may have migrated underground from the Burt's Chevron site to your property or that such migration may occur in the future.'" *Id.* In a second letter dated April 26, 2002, the LDEQ informed the plaintiffs that due to the results of air sampling at a stream near Burt's Chevron, some of which sampling was taken on their property, they should limit the time spent in that area.

On September 12, 2006, a company hired by the LDEQ sent correspondence to the plaintiffs seeking to access their property to perform remediation. The plaintiffs filed suit on September 6, 2007, against the owners of the neighboring property, the operator of the service station, and Chevron U.S.A, provider of the tanks and the gasoline stored in them. The defendants responded by filing a motion for summary judgment in which they claimed that the plaintiffs' claims were prescribed because they "acquired, or should have acquired, knowledge of the contamination and damage to their property with the receipt of the 2001 and 2002

14

letters from LDEQ, but failed to file suit until 2007." *Id.* at 966. In opposing the

motion, the plaintiffs asserted that they did not interpret the letters as putting them

on notice that the defendants' conduct had damaged their property. The trial court

denied the defendants' motion, finding that genuine issues of material fact

remained "regarding whether the LDEQ letters of 2001 and 2002 provided

constructive knowledge of tortious conduct and damage sufficient to commence

the running of prescription." *Id.* After the appellate court declined to exercise

supervisory jurisdiction, the supreme court granted certiorari, and framed the issue

before it as follows:

> [T]he dispute in this case centers around whether the information
> conveyed in the letters was sufficient to commence the running of
> prescription. Thus, while the question of subjective knowledge is
> ordinarily inappropriate for resolution by summary judgment, such a
> question is not presented here. In this case, there is no question as to
> what the plaintiffs knew and when. Plaintiffs' knowledge is contained
> in the letters. The question presented is whether this knowledge
> constitutes actual or constructive knowledge sufficient to commence
> the running of prescription. Because there are no factual conflicts
> presented, only conflicting conclusions based on the facts (the LDEQ
> letters), this question is one appropriate for resolution by summary
> judgment.

*Id.* at 999 (footnotes omitted). On the merits, the supreme court concluded that the

information contained in the LDEQ letters "was sufficient to excite attention and

put a reasonable person on guard to call for inquiry, which is the essence of

constructive knowledge," and that "plaintiffs' inaction in light of such action was

unreasonable." *Id.* at 1001. Ultimately, the *Hogg* court found that "[w]ith the

receipt of the second letter from LDEQ in 2002, the plaintiffs acquired constructive

knowledge of the damage to their immovable property sufficient to commence the

running of prescription." *Id.*

*Marin*, 48 So.3d 234, came before the supreme court after a trial on the merits, but it is nonetheless instructive regarding when the prescriptive period starts to run and when the discovery rule of *contra non valentum* should apply in a legacy case. The matter concerned two pieces of property. The first, known as the "Marin Property," was owned by three siblings and the second, known as the "Breaux Property," was owned by one of the siblings and her husband. Pursuant to mineral and surface leases entered into in the 1930s, Exxon Mobil Corporation, or its predecessors, conducted oil and gas operations on the two properties and built open and unlined pits where contaminants from those operations accumulated. Waste byproducts from the pits were released into a bayou on the property. The evidence showed that sugarcane farmers on the Marin Property knew by 1958 that their crops near the pit areas would not properly grow, and by the 1980s, the plaintiffs had the same concerns. Plaintiff Clyde Breaux, serving as a "family representative," made several demands on Exxon between 1988 and 1990 that it clean their properties and rid them of contamination so they could resume their farming activities. *Id.* at 240. By 1991, Exxon had closed all of the pits on the plaintiffs' properties and had assured them, via regular communication with Breaux, that it had remediated those areas in compliance with mandated state standards. The plaintiffs filed suit against Exxon in November of 2003 "for remediation of the soil and groundwater and other damages" after an environmental assessment conducted several months earlier revealed "significant contamination" on both properties. *Id.* at 241. After a trial on the merits, the trial court found that the plaintiffs' tort claims were suspended by *contra non valentum*. On writs, the supreme court disagreed, finding:

16

[The evidence is clear that plaintiffs knew by 1991 that sugarcane would not grow properly in the pit areas and had made demand on Exxon to clean and close the pits so that they could grow sugarcane. They knew that some of the pits were closed with sludge remaining at the bottom of the pits after the first attempt at closure, and they kept samples of the contents of this sludge. They knew that the pits contained some oilfield wastes (barites/drilling mud). They knew that certain of the pit areas were not stable enough to support farm equipment. They knew that Exxon was having trouble cleaning and closing the pits sufficiently to meet the applicable statewide standards. Although Exxon assured plaintiffs that they were in compliance in 1991, they remained suspicious of Exxon's assurances that the pits were remediated to statewide regulatory standards. After the attempted remediation in 1991, plaintiffs had the opportunity to observe that a healthy sugarcane crop was still not growing in spite of Exxon's efforts. Further, no new damage became apparent that was not already apparent in 1991; in fact, the pit areas still will not support healthy cane growth.

*Id.* at 248. The supreme court further held:

[The plaintiffs] had knowledge of damage that was apparent, i.e., dying sugarcane. Even though the damage they discovered later was more extensive, the sugarcane damage was an outward sign of "actual and appreciable damage," and was sufficient information to excite attention and put plaintiffs on guard and call for inquiry. We acknowledge that sugarcane takes some time to grow and by 1991, they would not have known whether the attempts at remediation were successful. In fact, Breaux testified it would take about 4 years to know if the sugarcane was going to be healthy. However, Breaux also testified that the sugarcane never did grow in some of the pit areas and has still not grown there today. We find that at least by 1995, plaintiffs had sufficient information to excite their attention and they should have investigated further at that time. Therefore, it was unreasonable to wait until 2003 to file suit.

*Id.* at 249-50.

*Analysis*

As the mover on summary judgment, BP was "required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which plaintiffs acquired actual or constructive knowledge of the damage." *Hogg*, 45 So.3d at 998. After having completed a de novo review of the evidence

17

submitted in favor of and against BP's motion for summary judgment, we conclude that BP is not entitled to summary judgment in its favor because many genuine issues of material fact remain in dispute.

BP contends that a white sandy area on two of the nine tracts that make up the property, and of which it offered evidence that only four Plaintiffs had seen, provided all Plaintiffs and/or their ancestors in title with actual or constructive knowledge of damage that was open and obvious and which should have prompted them to investigate further to ascertain the cause and extent of the contamination upon which this suit is based.

In order to prevail on its motion for summary judgment, BP first had to prove that no genuine issue of material fact remained regarding whether Plaintiffs sustained "actual and appreciable" damage to the property so as to excite their attention and lead them to delve further into the source and extent of that damage. *Labbe*, 650 So.2d at 829. BP provided only scant evidence of the characteristics of the white sandy area, simply describing it as an area that lacked vegetation and that had been observable by air since the 1940s. Relying on the deposition testimony of Craig Vincent, one of the four Plaintiffs who had actually seen the white sandy area, BP asserted that the following statements were undisputed material facts: "Mr. Vincent worked in the oil and gas industry for approximately forty years. He remember[s] that grass would die if someone spilled produced water on the ground. The White Sandy Area on the property is consistent with produced water spills he observed while working in the oil and gas industry." In its memorandum in support of summary judgment, BP argued that "[l]ike the damaged sugar cane in *Marin*, the White Sandy Area provided Plaintiffs with constructive knowledge of actual and appreciable damage" and gave them "sufficient information to excite

18

their attention[,] and they should have investigated further." We disagree. In this case, there were no crops whose growth was affected by an entity that was known to have contaminated the property and that had assured the landowners that it was remediating the property to state standards. *Marin*, 48 So.3d 234. In addition, Plaintiffs herein produced evidence that the property was entirely rural and that it had historically been used for cattle grazing and topsoil excavation. While an argument could be made that Craig Vincent should have recognized that the white sandy area evidenced actual and substantial damage attributable to oil and gas operations, his deposition testimony revealed that he did not suspect that the area was contaminated. Thus, we would have to make a determination as to his subjective knowledge of whether the white sandy area indicated damage that should have prompted him to investigate further, a task that the supreme court has said is "ordinarily inappropriate for resolution by summary judgment" *See Hogg*, 45 So.3d at 999; *Smith*, 639 So.2d 730. Moreover, BP produced no evidence that any of the twenty-five other Plaintiffs or their ancestors in title had any, or enough, experience in the oil and gas industry to even remotely suggest that they should have recognized that the white sandy area indicated "actual and appreciable" damage. *Labbe*, 650 So.2d at 829. In addition, because BP alleged that the current and historical aerial photographs attached to its motion showed that the characteristics of the property are the same now as they were in the 1940s, it has not shown that Plaintiffs' ancestors in title would have seen damage that was more actual and substantial than the damage that currently exists. Based on the evidence presented, we conclude that genuine issues of material fact remain regarding whether Plaintiffs' property had sustained "actual and appreciable" damage so as

to start the running of prescription against them or their ancestors in title. *Labbe*, 650 So.2d at 829.

Even if we were to conclude that BP had met its burden of proving that the white sandy area was damaged enough to begin the tolling of prescription, BP would also have to prove that Plaintiffs or their ancestors in title acquired or should have acquired knowledge of the damage and the date they acquired or should have acquired such knowledge. BP would have this court find that all twenty-six Plaintiffs acquired or should have acquired knowledge of the damage to their property, even though the evidence it produced showed that only four Plaintiffs had actually seen the white sandy area, because aerial photographs dating back to 1940 evidenced the same white sandy area that is depicted in current aerial photos. With regard to the Plaintiffs who admittedly rarely or never visited the property, BP argued that they should be deemed to have constructive knowledge of the damage because any lack of knowledge was due to their collective neglect of the property. As evidenced by its reasons for judgment, the trial court agreed with BP's argument, finding that it was "unreasonable for a plaintiff to have never stepped foot on his/her property" and that "plaintiffs' lack of knowledge about their property is attributable to their own willfulness and neglect."

Plaintiffs opposed BP's attempt to lump them together to determine their actual or constructive knowledge as to their damages, arguing that BP must prove what knowledge each individual Plaintiff had or should have had. Given their "education, intelligence, and the nature of [BP's] conduct," Plaintiffs argue that none of them had any reason to know that the property may have been damaged by BP or its predecessors. *See Marin*, 48 So.3d at 246. Moreover, as evidenced in the eight affidavits submitted by Plaintiffs in opposition to BP's motion, each denied

20

having received any notice from their ancestors in title or any other source informing them of actual contamination to their property caused by an identified entity. As such, Plaintiffs submit that this case is distinguishable from *Marin*, where one of the four plaintiffs acted as a "family representative" and the plaintiffs' case was filed approximately twelve years after they were found to have actual knowledge that Exxon had contaminated their property. *See Marin*, 48 So.3d at 240.

The property at issue in this case is rural and consists of nine separate tracts owned by twenty-six Plaintiffs, some, but not all, of whom are related. The white sandy area was located only on tracts seven and nine. However, as shown in BP's SUMF, each tract has up to seven owners, and while tracts five, six, and seven have the same seven owners, the remaining tracts do not have overlapping ownership. Unlike the five plaintiffs in *Hogg*, 45 So.3d 991, the Plaintiffs herein do not co-own the same tract of property, and there is no evidence that they or their ancestors in title were ever told that actual contamination had been detected nearby and could migrate to their property. BP has offered no evidence to prove each tract of the property was accessible to the owners of the remaining tracts. On the other hand, each of the affiants in the eight affidavits attached to Plaintiffs' opposition stated that they had never traversed the entire property. We find it unreasonable to expect the owner of a rural tract of property to visit and inspect nearby tracts of property. We, likewise, find it unreasonable to expect that a property owner would be aware of current or historical aerial images of its property and that of its neighbors or that such property owner would understand what was depicted in such images had they seen them. Accordingly, we conclude that BP failed to prove that

21

there are no genuine issues of material fact regarding whether any Plaintiff or their ancestors in title had actual or constructive knowledge of their damages.

Finally, BP offered no evidence as to the date Plaintiffs acquired actual or constructive knowledge of any such damages. Instead, it made the conclusory argument that because the last oil and gas operations of its predecessors on the property occurred in 1951 and because aerial photographs dating back to 1940 evidenced the same white sandy area that can still be seen in current aerial photos, Plaintiffs' claims prescribed before the filing of their petition on March 3, 2011. In obvious contradiction to that argument, however, BP asserted that the following statements[6] were undisputed material facts (footnotes omitted):

51. Plaintiffs Natalie Martinez, Raymond Reeds, Ernest Lowery, Jr., Howard Romero, Craig Vincent, and Leon Currie first heard about the alleged contamination from their attorneys.

52. Plaintiffs James Pratt, on behalf of Cam-Pratt, LLC, David Currie and Kathy Melancon testified that they do not know how they found out about the alleged contamination.

53. Plaintiff Brian Walker first learned about the potential contamination when his uncle told him about this lawsuit. Plaintiff James Walker first learned about the alleged contamination from his brother, Brian Walker.

54. Plaintiff Leonidas Pittman first found out about the alleged contamination from Leon "Larry" Currie.

55. Plaintiff Daniel Lowery first realized about the possibility of contamination of the property when he heard about this lawsuit being filed.

56. Plaintiffs neither testified nor offered any other proof of why Plaintiffs chose to file suit [] in 2010 – as opposed to any other point after the cessation of oil and gas operations on the Property.

---

[6] BP's argument that *contra non valentum* should not apply in this case was based on these statements. Nonetheless, we find them extremely relevant to the issue of when Plaintiffs acquired knowledge of their damages.

Plaintiffs cite La.Civ.Code art. 3493 in support of their claim that prescription in tort property damage cases begins to run when a plaintiff acquires actual or constructive knowledge of the damage, regardless of when the damaging conduct ceases. Plaintiffs also provided documentary evidence wherein they asserted that they did not receive knowledge of their claims or of the facts upon which those claims were based until being notified by family members or others less than one year before this suit was filed.

In *Hogg*, the supreme court found that the defendants proved the plaintiffs had constructive knowledge of their property damage upon the receipt of a letter from the LDEQ on April 26, 2002. *Hogg*, 45 So.3d at 999. In *Marin*, while the supreme court did not specify the exact date the plaintiffs had actual knowledge of damage, it found that "at least by 1995, plaintiffs had sufficient information to excite their attention[,] and they should have investigated further at that time." *Marin*, 48 So.3d at 250.

In the instant matter, BP did not attempt to point to the date, or even the year, that Plaintiffs or their ancestors in title acquired actual or constructive knowledge of their damages, nor did it offer any statutory or jurisprudential authority to support its argument that the mere passage of time starts the tolling of prescription. In addition, BP's SUMF contains statements which support Plaintiffs' claims that they lacked the knowledge upon which their suit was based until less than one year before they filed suit. Accordingly, we find that BP failed "to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which plaintiffs acquired actual or constructive knowledge of the damage." *Hogg*, 45 So.3d at 998. Thus, we find merit to Plaintiffs' first assignment of error. As a

result, Plaintiffs' remaining assignments of error are moot and need not be addressed.

## CONCLUSION

As noted previously, BP's burden on summary judgment was "to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which plaintiffs acquired actual or constructive knowledge of the damage." *Hogg*, 45 So.3d at 998. Our de novo review of the evidence offered in support of and against BP's motion for summary judgment reveals the presence of several genuine issues of material fact which preclude the grant of summary judgment in its favor. Accordingly, the trial court erred in finding that Plaintiffs' claims were prescribed, and its judgment must be reversed.

## DECREE

For the foregoing reasons, the judgment of the trial court granting the motion for summary judgment based on prescription filed by defendant, BP America Production Company (BP), and dismissing their claims against it, is reversed and the matter is remanded. All costs of this appeal are assessed against BP.

**REVERSED AND REMANDED.**